**CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND and Paul Glover, Plaintiffs–Appellants,**

**v.**

**LOUIS ZAHN DRUG CO., Defendant–Appellee.**

**No. 88–2498.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1989.

Decided Dec. 11, 1989.

Martin J. Burns, Stephen B. Horwitz (argued), Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiffs-appellants.

Ira Gould (argued), Lawrence I. Davidson, J. Michael Williams, Holleb & Coff, Chicago, Ill., for defendant-appellee.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund (the Fund) brought an action in the district court to vacate an arbitrator's award in favor of Louis Zahn Drug Company (Zahn). The arbitrator had found Zahn free of withdrawal liability to the Fund under certain provisions of the Employee Retirement Income Security Act of 1974 (ERISA) as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). Zahn responded by filing a motion for summary judgment. The district court referred Zahn's motion to a magistrate. The magistrate recommended that the arbitrator's award stand. The district court adopted the magistrate's Report and Recommendation and granted Zahn's motion for summary judgment. The Fund[1] now appeals the district court's order granting summary judgment. For the following reasons, we affirm.

## I

## BACKGROUND

### A. *Withdrawal Liability Under MPPAA*

In *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir.1989), Judge Kanne, writing for the court, succinctly explained the statutory scheme governing the liability of an employer who withdraws from a multi-employer pension plan:

> MPPAA was enacted by Congress to cure the problems arising when an employer ceased making payments to a pension plan fund. When an employer ceased making such payments, the plan would be left with vested pension obligations which were only partially funded. MPPAA provides that an employer who withdraws from a pension plan covered under it becomes liable for an amount of money designed to cover the employees' share of vested, but unfunded, benefits. 29 U.S.C. §§ 1381(a), 1382; *Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1055–56 (7th Cir.1988) *and*

cases cited therein; *Robbins v. B & B Lines*, 830 F.2d 648, 649 (7th Cir.1987).

Under MPPAA, after the sponsor of a multiemployer plan determines that an employer has "withdrawn" within the meaning of 29 U.S.C. §§ 1383, 1385, the sponsor must issue a notice and demand for payment of the employer's withdrawal liability. The notice must include a schedule of payments. 29 U.S.C. § 1399(b)(1). Within 90 days after receiving the notice and demand, the employer may ask the plan's sponsor "to review any specific matter relating to the determination of the employer's liability and the schedule of payments," 29 U.S.C. § 1399(b)(2)(A)(i). After a "reasonable review of any matter raised," the sponsor must notify the employer of its decision. 29 U.S.C. § 1399(b)(2)(B).

If the employer disagrees with the plan's sponsor's decision on review, it must initiate arbitration within 60 days after the earlier of the date it is notified of the decision or 120 days after its request for review. 29 U.S.C. § 1401(a)(1).

### B. *Facts*

Zahn is a wholesale distributor of drugs and related products. Its customers include retail drug stores, nursing homes, and hospitals. In order to transport its products to its customers, Zahn maintained its own delivery operation by leasing trucks and hiring drivers who were members of the Union. Zahn and the Union drivers entered into a collective bargaining agreement (CBA) covering the period from April 1, 1982 through March 31, 1985. During this period, Zahn was required to make contributions to the Fund, a multiemployer pension plan as defined in 29 U.S.C. §§ 1002(37)(A) and 1301(a)(3). By 1984, however, Zahn concluded that it could not operate efficiently its delivery system and decided to terminate its trucking operations. Thus, on January 11, 1985, Zahn entered a transaction with George A. Nuelson Teaming Co. (Nuelson) that consisted of three separate agreements: (1) the Sublease Agreement (SA), under which Zahn

---

**1.** We have no jurisdiction to hear the appeal of Fund trustee Paul Glover because he was not named as a party in the notice of appeal. R.43.

*See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 2407, 2409, 101 L.Ed.2d 285 (1988).

assigned to Nuelson all of the vehicle leases used in Zahn's trucking operations; (2) the Motor Transportation Agreement (MTA), under which Zahn agreed to discontinue its own trucking operations and use Nuelson as its exclusive hauler; and (3) the Asset Purchase Agreement (APA), which memorialized numerous other transactions. Under the APA, Zahn and Nuelson agreed to the following: Zahn sold Nuelson $10,000 worth of assets related to its trucking operations; Nuelson assumed all of Zahn's rights and obligations under the CBA (including the duty to contribute to the Fund); Nuelson agreed to provide a bond to the Fund for a five-year period to ensure its continued contribution to the Fund; all drivers under the CBA became drivers of Nuelson; and Zahn remained secondarily liable to the Fund if Nuelson failed to discharge its assumed obligations to the Fund during the five-year period following the transaction.[2] R.18, Ex. A at 3–4 [hereinafter Arb. Award]. Zahn had made all its required contributions to the Fund up to the date of the Nuelson transaction, and Nuelson has made all required contributions since the transaction date.

On April 15, 1985, the Fund notified Zahn that the cessation of its trucking operations constituted a complete withdrawal from the Fund for which Zahn had incurred "withdrawal liability" of $428,000 under 29 U.S.C. § 1382.[3] Zahn invoked its right under 29 U.S.C. § 1399(b)(2)(A)(i) to have the "plan sponsor" (the trustees of the Fund) review the withdrawal liability determination. Zahn argued that it was exempt from withdrawal liability because its transaction with Nuelson constituted a "bona fide, arm's-length sale of assets" within the meaning of 29 U.S.C. § 1384(a)(1).[4] The

2. Three of the separate agreements memorialized in the Asset Purchase Agreement—Nuelson's assumption of the obligation to make contributions to the plan for substantially the same number of contribution base units as Zahn, its posting of a bond for a period of five years to ensure its continued contribution to the Fund, and the provision in the contract of sale making Zahn secondarily liable if Nuelson withdraws within five years from the effective date of the Zahn–Nuelson transaction—were necessary to comply with 29 U.S.C. § 1384(a)(1)(A), (B), and (C). These conditions must be met in order for even a "bona fide, arm's-length sale of assets to an unrelated party" to be exempt from withdrawal liability. The parties stipulated that these conditions had been satisfied. Arb. Award at 6. *See infra* note 4; *see also I.A.M. Nat'l Pension Fund, Plan A v. Clinton Engines Corp.*, 825 F.2d 415, 420 n. 11 (D.C.Cir.1987).

3. 29 U.S.C. § 1382 provides as follows:
 When an employer withdraws from a multiemployer plan, the plan sponsor, in accordance with this part, shall—
 (1) determine the amount of the employer's withdrawal liability,
 (2) notify the employer of the amount of the withdrawal liability, and
 (3) collect the amount of the withdrawal liability from the employer.

4. 29 U.S.C. § 1384(a) provides, in pertinent part:
 (1) A complete or partial withdrawal of an employer (hereinafter in this section referred to as the "seller") under this section does not occur solely because, as a result of a *bona fide, arm's-length sale of assets to an unrelated party* (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if—
 (A) the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan;
 (B) the purchaser provides to the plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to the greater of—
 (i) the average annual contribution required to be made by the seller with respect to the operations under the plan for the 3 plan years preceding the plan year in which the sale of the employer's assets occurs, or
 (ii) the annual contribution that the seller was required to make with respect to the operations under the plan for the last plan year before the plan year in which the sale of the assets occurs,
 which bond or escrow shall be paid to the plan if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due, at any time during the first 5 plan years beginning after the sale; and
 (C) the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 plan years, the seller is secondarily liable for any withdrawal liability it would have had to the plan with respect to the operations (but for this section) if the liability of the purchaser with respect to the plan is not paid.

Fund's trustees concluded that Zahn's transaction with Nuelson did not constitute a "sale of assets"; instead, the trustees concluded that the "principal purpose" of the transaction was to "evade or avoid [withdrawal] liability" in violation of 29 U.S.C. § 1392(c).[5] The dispute was submitted to arbitration pursuant to 29 U.S.C. § 1401.[6]

### 1. The Arbitrator's Award

The sole issue before the arbitrator was "whether the Nuelson transaction [was] a sale of assets by Zahn within [29 U.S.C. § 1384(a)(1)], or [whether] the principal purpose of the Nuelson transaction [was] to evade or avoid withdrawal liability under [29 U.S.C. § 1392(c)]." Arb. Award at 6. The arbitrator determined that Zahn was exempt from withdrawal liability because the Zahn–Nuelson transaction was a "sale of assets" within 29 U.S.C. § 1384 and because the primary purpose of the transaction was not to "evade or avoid" withdrawal liability. *Id.* at 9.[7]

### 2. Magistrate's Report and Recommendation

Pursuant to 29 U.S.C. § 1401(b)(2), the Fund filed an action in district court to vacate the arbitrator's award. Zahn, in answering the Fund's complaint, moved for summary judgment. The matter was then referred to a magistrate, who issued a written Report and Recommendation in favor of granting summary judgment. The magistrate noted that the standard under which an arbitrator's findings of fact are reviewed is set forth in 29 U.S.C. § 1401(c) and was undisputed: "[b]oth parties agree that the findings of fact made by an arbitrator are presumptively correct and may be rebutted only by a clear preponderance

(emphasis supplied).

**5.** 29 U.S.C. § 1392(c) provides that "[i]f a principal purpose of any transaction is to *evade or avoid liability* under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." (emphasis supplied).

**6.** 29 U.S.C. § 1401(a)(1) states in pertinent part that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."

of the evidence." R.36 at 4 [hereinafter Mag. Rep.]. Although the magistrate noted that section 1401(c) does not provide a standard for reviewing the arbitrator's conclusions of law, the magistrate concluded that "[a]n arbitrator's decision will not be overturned due to an error of law committed in the interpretation of the underlying collective bargaining agreement." Mag. Rep. at 5. Rather, a decision will be overturned only "if the arbitrator bases his decision on factors outside his expertise, or where the decision involves a manifest disregard for the law." *Id.*[8]

The magistrate rejected the Fund's argument that the arbitrator's application of 29 U.S.C. § 1384(a) in determining whether Zahn's transaction was a "sale of assets" involved statutory considerations outside his expertise. *Id.; see also Jaspan v. Certified Indus. Inc.*, 645 F.Supp. 998, 1006 (E.D.N.Y.1985) (stating that a dispute that "hinges upon the application of § 1384 ... must be resolved through arbitration"). The magistrate also rejected the Fund's challenge to the arbitrator's findings of facts, concluding that "[t]he Fund's arguments attack the arbitrator's interpretation of the facts rather than point to a preponderance of contradictory evidence." Mag. Rep. at 7. The magistrate then concluded that "[a]ll the evidence presented at the hearing can be said to support the arbitrator's findings. While this court may not have decided the case in the same manner as the arbitrator, its scope of review is limited. The arbitrator's decision in this case should stand." *Id.*

### 3. The District Court Order

The district court adopted the magistrate's recommendation and granted Zahn's

**7.** The arbitrator's award is described in considerable detail in Part II, subpart B, *infra*.

**8.** The magistrate's Report and Recommendation was filed before this court's decision in *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 211–12 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989), which held that an arbitrator's determinations of law are subject to *de novo* review.

motion for summary judgment. *See* R.40 [hereinafter Dist. Ct. Minute Order]. In its order granting summary judgment, the district court ruled on the three objections the Fund raised to the magistrate's report. The Fund's first two objections were that the magistrate applied an incorrect standard of review to the arbitrator's decision and that both the arbitrator and the magistrate erred in concluding that the Zahn transaction satisfied the requirements of section 1384. The district court rejected these arguments, holding that "whether these conclusions involve questions of law, questions of fact, or mixed questions of law and fact, the Court finds that the arbitrator's conclusions are clearly supported, that these conclusions are not erroneous as a matter of law, and that the § 1384 requirements have been satisfied." Dist. Ct. Minute Order at 2. The Fund's third objection was that the case should be remanded to the arbitrator to consider the relationship between the buyer, Nuelson, and Wells Company, a third party from whom Zahn had leased trucks prior to Zahn's assignment of those leases to Nuelson. The district court held that the Fund had waived its right to this objection by its failure to object during arbitration, or, alternatively, that even if the Zahn–Wells relationship had been considered, it would have had no effect on the arbitrator's award. Thus, the district court adopted the magistrate's Report and Recommendation and granted summary judgment for Zahn. The Fund now appeals the district court's grant of summary judgment.

## II
## ANALYSIS
A. *The Applicable Standard of Review*

We first must address whether the district court applied the appropriate standard of review in its scrutiny of the arbitrator's decision. More precisely, we must determine the appropriate standard of review for the arbitrator's determination that the Zahn transaction constituted a "bona fide sale of assets" and that the transaction was not to "evade or avoid liability."

Our task is one of statutory interpretation. In enacting the statutory scheme for withdrawal cases under MPPAA, Congress directly addressed the standard of review for findings of fact: "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c). Similarly, with respect to questions of law, we previously have determined that MPPAA's "broad mandate allowing courts to 'enforce, vacate, or modify the arbitrator's award'" requires that courts "fully review an arbitrator's legal determinations." *Trustees of Iron Workers Local 473 Pension Trust v. Allied Prods. Corp.*, 872 F.2d 208, 212 (7th Cir.) (quoting 29 U.S.C. § 1401(b)(2)), *cert. denied*, —— U.S. ——, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989). The issues under review here—whether the transaction constituted a "bona fide sale of assets" and whether the transaction was to "evade or avoid liability"—cannot be characterized comfortably either as "questions of fact" or "questions of law." Rather, as the appellant suggests, Appellant's Br. at 9–11, they are classic examples of "mixed questions of law and fact"—"questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982).[9]

9. *See Crown Cork & Seal Co. v. Central States Southeast and Southwest Areas Pension Fund,* 881 F.2d 11, 18 & n. 19 (3d Cir.1989) (holding that questions under amended MPPAA whether there was a " 'binding agreement to withdraw' ... and, if so, whether a 'complete withdrawal' occurred" were best viewed as mixed questions of law and fact; also noting that question whether employer had " 'permanently cease[d] all covered operations under the plan' pursuant to 1383(a)(2) ... is best characterized as a mixed factual and legal one"); *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1250 (3d Cir.1987) (noting that " '[w]hether the requirements of [a statutory] safe-haven have been satisfied necessarily turns on the facts of each case' ") (quoting *Banner Indus., Inc. v. Central States, Southeast and Southwest Areas Pen-*

With respect to "mixed questions of law and fact," MPPAA contains no explicit standard of review. Consequently, mindful that our task is to articulate a standard that reflects the intent of Congress, we must determine the appropriate standard of review for the issues before us. In undertaking this task, we must begin by recalling the

> practical truth that the decision to label an issue a "question of law," a "question of fact," or a "mixed question of law and fact" is sometimes as much a matter of allocation as it is of analysis. See Monaghan, Constitutional Fact Review, 85 Colum.L.Rev. 229, 237 (1985). At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.

*Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985). In the situation before us, Congress has made some clear choices with respect to the relative capacities of the arbitrator and the courts in resolving withdrawal liability issues. First, the statute embodies a strong policy that any dispute of this nature be submitted to arbitration. *See* 29 U.S.C.

§ 1401.[10] As our colleagues in the District of Columbia Circuit have noted:

> [i]n establishing the arbitrative scheme, as in establishing an administrative agency, Congress has expressed a preference for initial resolution of the dispute in a non-judicial forum. Second, an arbitrator skilled in pension and labor matters, like an agency in a given administrative area, is in theory likely to fashion superior resolutions of disputes within the arbitrator's area of expertise. Third, initial resort to arbitration, like initial resort to an administrative tribunal, promotes judicial economy both because an arbitrator's decision may dispose of the dispute, and because, even if one party appeals the arbitral decision, courts will have the benefit of the arbitrator's sifting of the facts.

*I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 727 F.2d 1204, 1208 (D.C. Cir.1984) (footnote omitted). Second, Congress has mandated explicitly that the arbitrator's factual determinations are subject to great deference by reviewing courts. *See* 29 U.S.C. § 1401(c). Finally, as this court held squarely in *Iron Workers,* the arbitrator's legal rulings are subject to *de novo* review by a reviewing court. 872 F.2d at 211–12. *See* 29 U.S.C. § 1402(b)(2).

These policy choices, when considered together, require that we acknowledge "the prime role Congress so plainly assigned to

---

sion Fund, 657 F.Supp. 875, 882 (N.D.Ill.1987), aff'd 875 F.2d 1285 (7th Cir.1989)) (brackets in original); *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 634–35 (4th Cir.1983) (whether certain terminals constituted a "facility" within 29 U.S.C. § 1397(a) was "a nice [mixed] question of fact and law"), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Robbins v. Chipman Trucking Inc.,* 693 F.Supp. 628, 638 (N.D.Ill.1986) (discussing mixed questions of law and fact in the context of MPPAA), aff'd 866 F.2d 899 (7th Cir.1988); *see also Lads Trucking Co. v. Board of Trustees of Western Conference of Teamsters Pension Trust Fund,* 777 F.2d 1371, 1373 (9th Cir.1985) (under ERISA section providing for mandatory attorneys' fees in actions to collect delinquent contributions, "[m]ixed questions of law and fact in which the applicable legal standard provides for a strict factual test subjects the lower court to clearly erroneous review").

**10.** 29 U.S.C. § 1401(a)(1) provides in part that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall be resolved* through arbitration." (emphasis supplied). *See Banner Indus., Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 875 F.2d 1285, 1288 & n. 2 (7th Cir.1989) (noting that the word "shall" is ordinarily mandatory rather than precatory and concluding that the "evade or avoid" determination initially should be decided by arbitration); *Robbins v. Admiral Merchants Motor Freight, Inc.,* 846 F.2d 1054, 1057 (7th Cir.1988) ("Very simply, § 1401(a)(1) requires arbitration of any dispute regarding a determination made under §§ 1381–1399."). *But see Trustees of the Chicago Truck Drivers Pension Fund v. Central Transport, Inc.,* 888 F.2d 1161, 1164–65 (7th Cir.1989) (noting, without approval or disapproval, bankruptcy court decisions adjudicating withdrawal liability without resort to arbitration).

arbitration in the MPPAA dispute resolution scheme." *Grand Union Co. v. Food Employers Labor Relations Ass'n,* 808 F.2d 66, 70 (D.C.Cir.1987); *see also I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.,* 825 F.2d 415, 418 (D.C.Cir.1987). Congress concluded that arbitration could resolve "a substantial portion of disputes ... promptly and efficiently through informal procedures." *Id.* at 422. Moreover, " 'the special knowledge and expertise of a skilled labor and pension law arbitrator,' " *Grand Union Co.,* 808 F.2d at 70 n. 5 (quoting *Grand Union,* 6 Employee Benefits Cas. (BNA) 2531, 2534), can assess non-recurring, fact-specific issues not only efficiently but realistically. Therefore, when the issue is one that requires either fact-finding expertise or where the arbitrator's special expertise in the area of pension law can contribute significantly to the decision, substantial deference ought to be given to the decision of the arbitrator.

 Articulating that deferential standard for the mixed questions at issue here presents at least some theoretical problems of a semantical nature. MPPAA itself requires that the arbitrator's findings of fact be reviewed under a "clear preponderance of the evidence" standard in the MPPAA context. 29 U.S.C. § 1401(c). The parties have cited us to no case defining the "clear preponderance of the evidence" standard, but, if that standard is a higher standard of scrutiny than the clearly erroneous standard, it would be incongruous to review fact determinations under a higher standard than the one employed for review of mixed questions of law and fact. However, in our view, for purposes of reviewing the arbitrator's resolution of mixed questions, the "clear preponderance of the evidence" standard and the "clearly erroneous" standard ought to be considered functionally equivalent standards of review. Thus, we shall review the arbitrator's resolution of mixed questions under the clearly erroneous standard.

Nevertheless, while we adopt such a standard for fact-specific, non-recurring determinations, we hasten to add a cautionary note. While the line between "questions of law" and "mixed questions of law and fact" is admittedly a vague one, *see Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1255 (3d Cir. 1987) (citing *Robbins v. Chipman Trucking, Inc.,* 693 F.Supp. 628, 638 (N.D. Ill. 1986), *aff'd,* 866 F.2d 899 (7th Cir.1988)), it is an important one. As we already have held in *Iron Workers,* 872 F.2d at 211, contrary to the usual scheme in arbitration matters,[11] Congress *did* intend that all legal determinations by an arbitrator be subject to *de novo* review. Consequently, the parties have a right to expect that the reviewing court will scrutinize fully the arbitrator's understanding of the underlying legal principles.[12]

B. *Application of the Standard of Review*

 In this case, the arbitrator had to determine whether the transaction constituted a "bona fide sale of assets" or wheth-

---

**11.** *See* 9 U.S.C. § 10; *see also Union Asphalts and Roadoils, Inc. v. MO–KAN Teamsters Pension Fund,* 857 F.2d 1230, 1234 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989); *Republic Indus., Inc. v. Teamsters Joint Counsel No. 83 of Virginia Pension Fund,* 718 F.2d 628, 641 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

**12.** In *Iron Workers,* this court held that, for purposes of determining employer's withdrawal liability under ERISA, *complete withdrawal* within the meaning of the statute occurred when the employer permanently ceased all covered operations under the plan. Liability was not triggered when "virtually all," rather than all, covered operations came to a halt. 872 F.2d at 212–14. *Iron Workers,* then, involved an in-

terpretation of the statutory requirement rather than a mere application of a particular fact to a settled principle of law. Similarly, in *T.I.M.E.– DC, Inc. v. Management–Labor Welfare & Pension Funds of Local 1730 International Longshoremen's Ass'n,* 756 F.2d 939, 948 (2d Cir. 1985), the court determined a " 'certified change of collective bargaining representative' " took place for purposes of section 1415 when "the NLRB rules that a group of employees previously represented by one unit will be under the jurisdiction of a second unit." *Id.* While the second circuit initiated its discussion by stating that "[t]he application of § 1415 raises mixed questions of law and fact," *id.* at 947, its subsequent discussion makes it clear that, like our court in *Iron Workers,* it was dealing with a question of statutory interpretation.

er the transaction was to "evade or avoid liability." There was no real disagreement between the parties with respect to the relevant and material facts. The arbitrator's task was to assess the significance of the established historical facts and determine whether there had been a "bona fide sale of assets" and whether the transaction was undertaken to "evade or avoid liability." These terms are given no special meaning in MPPAA. In undertaking this assessment, the arbitrator first determined that each of the three agreements—the MTA, the SA, and the APA—could not be analyzed separately. In his view, the intent of the parties was to treat the three agreements as part of a single transaction. The arbitrator concluded that, analyzed from this perspective, the transaction was designed to relieve Zahn of a part of its business that was producing significant losses—not to avoid withdrawal liability. Furthermore, the arbitrator, considering the three agreements as components of a single transaction, determined that there had been a "bona fide sale of assets." "By looking at the whole Nuelson transaction rather than just the APA, Nuelson (1) paid ten thousand dollars ($10,000.00), (2) assumed hundreds of thousands of dollars of Lease payments, and (3) secured a bond to ensure payments to the Pension Fund. Moreover, Zahn was secondary [sic] liable if Nuelson failed to discharge its obligation." Arb. Award at 7. In reply to the Fund's argument that the leases were of no value and therefore not assets, the arbitrator noted that Nuelson's assumption of the leases established that they had value. They were an " 'integral part of the purchasers' performance of the work that gave rise to the sellers' obligation to contribute to the plan....' " *Id.* at 8 (quoting Pension Benefit Guaranty Corporation (PBGC) Opinion Letter 87–2).

The arbitrator's determination that it was appropriate to assess the transaction as a whole rather than in its component parts and that, in so analyzing the transaction, anything of value might be considered, is a determination of law. Therefore, it is subject to our *de novo* review. The arbitrator, relying on an opinion letter of the PBGC in an earlier, unrelated transaction, concluded that the purpose of ERISA section 4204, 29 U.S.C. § 1384, was best fulfilled by considering all things that "are an integral part of the purchasers' performance of the work that gave rise to the sellers' obligation to contribute to the plan." Arb. Award at 8 (quoting PBGC Opinion Letter 87–2). We agree. Such a common sense interpretation of the statutory language is indeed compatible with both the language of this particular statutory section and with the overall statutory scheme.

The arbitrator's determination that the particular leases involved in this transaction have value, and that the transaction was not to evade or avoid liability are, as we have already noted, mixed questions of law and fact. While we review such matters under a deferential standard of review, that "does not mean no appellate review." *In re Ronco, Inc.,* 838 F.2d 212, 217 (7th Cir.1988). Whether these particular leases have value is a determination reached by the arbitrator only after an assessment of all aspects of this particular transaction. He concluded that, despite the liability incurred through the assumption of these leases, they obviously had value to the purchaser in light of the object of the entire transaction—to sell the purchaser what it needed to undertake the transportation responsibilities previously performed by the seller.

The need for deference to the arbitrator's expertise is even more obvious on the issue of whether the seller sought to evade or avoid withdrawal liability. Matters of intent are particularly suited for resolution by the decision-maker with initial fact-finding responsibilities. Here, the arbitrator relied on the business history of Zahn, especially the effect that excessive transportation costs were having on its competitive posture. Analyzing the transaction in light of Zahn's business situation, the arbitrator concluded that the transaction was not to avoid withdrawal liability. We cannot say that such a determination is clearly erroneous.

## CONCLUSION

The arbitrator committed no error of law. His assessment of the transaction is supported by the record. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.