**SHERWIN–WILLIAMS COMPANY,**
**Plaintiff,**

v.

**NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, Defendant.**

**No. 1:94 CV 0493.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 31, 1997.

---

Harold H. Reader, III, Ronald L. Kahn, Ulmer & Berne, Cleveland, OH, for Plaintiff.

Gerald J. Green, Peter P. Paravati, Vincent M. DeBella, Law Offices of Peter C. Paravati, Utica, NY, for Defendant.

## MEMORANDUM OF OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court upon the Report and Recommendation of a Magistrate Judge of this Court submitted on February 29, 1996 (Document # 45). The Report and Recommendation is ADOPTED and the decision of the Arbitrator is AFFIRMED.

Plaintiff, Sherwin–Williams Company ("Sherwin–Williams"), filed this action pursuant to 29 U.S.C. § 1401(b)(2), seeking to vacate that portion of an arbitration award favorable to defendant, New York State Teamsters Conference Pension and Retirement Fund ("Teamsters Fund") and to enforce another portion favorable to Plaintiff. In his ruling, the Arbitrator found that a principal purpose of Plaintiff's sale of the stock of one of its subsidiaries was to evade or avoid withdrawal liability under the Employee Retirement Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendment Act of 1980 (MPPAA), and thus confirmed Defendant's assessment of withdrawal liability to Plaintiff when its former subsidiary withdrew from the Teamsters Fund by reason of its bankruptcy. The Arbitrator also ruled in Sherwin–Williams' favor that the Teamsters Fund was not entitled to "gap year" interest. Now pending before the Court is the motion of the Teamsters Fund to dismiss the Complaint and to enforce, in part, the arbitration award (Document # 20); and the motion of Sherwin–Williams for summary judgment on its Complaint (Document # 21).

### Statement of Facts

Sherwin–Williams is engaged in the manufacture, distribution and sale of coatings and related products. The Teamsters Fund is a multiemployer benefit plan as defined in ERISA, 29 U.S.C. § 1002(37) and is regulated by ERISA as amended by MPPAA. Lyons Transportation Lines, Inc. ("Lyons") was a less–than–truckload ("LTL") regional motor carrier founded in 1928 in Erie, Pennsylvania. Lyons was a participating employer in the Teamsters Fund and was a signatory to a participation agreement which provided the obligation to contribute to the Teamsters Fund. Lyons was also a participating employer in two other Teamster sponsored multiemployer pension plans.

In January, 1987, Sherwin–Williams, through one of its subsidiaries, purchased 100% of the outstanding stock of Lyons for $14,204,765.79. Plaintiff acquired Lyons because it recognized that transportation costs were a significant factor in an economic environment where the final customer would resist further price increases, thereby favoring local producers with lower distribution costs. Further, Plaintiff knew that its customers refused to carry high levels of inventory but continued to demand a high level of service response, resulting in Plaintiff's local and regional competitors enjoying a geographic service facility advantage. Sherwin–Williams determined that acquiring a regional LTL carrier would enable it to lower distribution costs, to improve service, and provide competitive freight costs. Sherwin–Williams developed a "rolling warehouse" where inventory could be maintained in trucks and be available for prompt delivery to local customers. Finally, after evaluating trends in the motor carrier industry, Plaintiff believed that acquisition of a regional LTL carrier could prove to be a profitable investment.

Contrary to Plaintiff's projections, with the exception of a few months, Lyons incurred substantial losses and failed to meet the objectives for which it was acquired. Sherwin–Williams was forced to subsidize Lyons each year of its ownership in order to sustain Lyons' operations. Lyons financial position was known to people inside and outside the trucking industry due to publicly available information. In 1989, Sherwin–Williams began to receive unsolicited offers for the purchase of Lyons' stock. Several parties expressed interest in purchasing Lyons' stock, including the eventual purchaser, J.R.C. Acquisition Corporation ("JRC").

Following the contacts regarding acquisition of Lyons, Sherwin–Williams reevaluated its acquisition of Lyons' stock and determined that the benefits it anticipated had not accrued. In or around May of 1989, the President and General Manager of Sherwin–Williams Transportation Services Division,

Robert Kinney, asked W.D. James, Lyons' President, to investigate and report on alternative operational and organizational means of making Lyons profitable. Mr. James reported that it would take at least three years to turn Lyons around and make it profitable. Unwilling to spend the time and additional money it would take to keep Lyons for another three years, Sherwin–Williams' Board of Directors authorized the sale of Lyons in October, 1988.

Mr. Kinney received a letter dated January 12, 1990, from JRC, submitting a proposal to acquire Lyons. The JRC proposal identified JRC as a company formed by Jonathan M. Tendler and Robert M. Castello, the principal officers of Commons Brothers, Inc., one of the largest distributors of pharmaceuticals in the tri–state New York metropolitan area, with sales in excess of $200,000,000. Following this communication, Sherwin–Williams provided the principals of Commons Brothers, Inc. and JRC with confidential information relating to the operations of Lyons.

During this time period, Sherwin–Williams also received proposals for the purchase of Lyons from other groups. Mr. Kinney met with individuals on behalf of R.J.M. Associates, Inc. and received an offer to purchase all of the shares of Lyons for $6,000,000, subject to due diligence and negotiation of a definitive agreement. That offer was later amended to $8,000,000.

Sherwin–Williams also received an offer form Baytree Investors, Inc., offering to buy all outstanding shares of Lyons for $8,500,-000 consisting of § 2,000,000 cash and the balance as preferred stock, redeemable in 24 months; subject to due diligence and execution of a definitive purchase agreement.

Sherwin–Williams also negotiated with Arrow Carrier Corporation ("Arrow"), a large northeastern motor carrier headquartered in New Jersey. Sherwin–Williams cut off negotiations with Arrow when it learned of the financial difficulties of Arrow and its president.

After making inquiries with respect to the bidding parties and evaluating each offer, Sherwin–Williams decided to focus on JRC as the most likely bidder for Lyons. Sher-win–Williams proposed that the stock be sold to a wholly owned subsidiary of Commons Brothers, Inc. formed for the acquisition. Mr. Castello and Mr. Tendler insisted that Commons Brothers, Inc. not be the purchaser since it was involved in a concurrent transaction to acquire a French pharmaceutical company.

In its due diligence requests, JRC requested a schedule of current pension liabilities calculated as of December 31, 1989. In response, Lyons sent letters to Defendant and the other funds to which Lyons contributed requesting information with respect to potential withdrawal liability in the event of a complete or partial withdrawal in 1990. The Teamsters Fund provided Lyons with some basic fund data and indicated that for a fee of $500 the Teamsters Fund would calculate the potential withdrawal liability figure. Lyons requested the calculation and received the computations from the Teamsters Fund sometime after May 16, 1990.

JRC and Sherwin–Williams executed a letter of intent on February 22, 1990, for the purchase of all the issued and outstanding stock of Lyons for a cash purchase price of $7,850,000, contingent on verification that the unfunded ERISA liability of Lyons did not exceed $7,000,000, or such greater amount as the parties agreed upon. The parties executed a definitive Agreement for Sale and Purchase of Stock ("Agreement") on May 17, 1990, reflecting a closing date of May 31, 1990, and calling for a down payment of § 1,600,000, with the balance of $6,250,000 payable in accordance with the terms of a promissory note over a period of six years. The note was secured by mortgages on Lyons' real property. Sherwin–Williams agreed to contribute approximately $18,000,-000 to the paid–in–capital of Lyons in order to eliminate certain intercompany accounts between Lyons and Sherwin–Williams. The Agreement provided a representation and warrant from JRC that it had not agreed to encumber or grant any lien on Lyons' assets to anyone other than Sherwin–Williams.

In April, 1990, Mr. Farrell, Mr. Castello and Mr. Tendler formulated and prepared a written business plan for Lyons to improve Lyons and its financial operations. Although

Sherwin–Williams was informed of the existence of the business plan, it was not made available to Sherwin–Williams due to concerns about the proprietary and confidential nature of the plan.

The sale closed on June 1, 1990, and the existing officers and directors of Lyons resigned and JRC assumed control of Lyons. JRC installed new directors and officers, none of which had any prior connection with Lyons or Sherwin–Williams. After the sale, Lyons continued to make contributions to the Teamsters fund through August 25, 1990. No contributions were made after August 25, 1990.

Prior to the closing, on or about May 25, 1990, JRC and its principals executed in the name of Lyons an Accounts Receivable Factoring and Security Agreement ("Security Agreement") with Allstate Financial Corporation ("Allstate"). There is no tangible evidence that Sherwin–Williams had knowledge of the Security Agreement before Lyons filed for Bankruptcy in October, 1990. However, neither JRC nor its principals had authority before or at the time of the closing to execute such an agreement on behalf of Lyons. Purportedly without the knowledge or approval of Sherwin–Williams, JRC used the proceeds obtained from Allstate to make the cash payment of $1,600,000 on June 1, 1990. From June 1, 1990, until sometime in November 1990, Allstate provided additional funds to Lyons, retained certain accounts receivable payments made to Lyons, and charged financing fees to Lyons.

Lyons continued to have serious operational and financial problems under the control of JRC. After the sale, the divisions of Sherwin–Williams utilizing Lyons' services experienced a downturn in the quality and timeliness of the services. Nevertheless, they continued to use Lyons' services during June and July. However, as a result of Lyons' failure to pay for the services provided by Certfied Distribution Services, Ins. ("CDSI"), Mr. Kinney, the president of CDSI, sent Lyons a 30 day termination notice on August 2, 1990, regarding the cartage agreement between Lyons and CDSI and informed Lyons that effective immediately it would not accept any freight from Lyons, nor would it line haul or perform brokerage services unless such services were prepaid by Lyons.

On September 12, 1990, Sherwin–Williams sent letters to Lyons demanding payments of $74,099.05 due on August 31, 1990, for Lyons' sublease of 119 trailers and of § 78,125 as the first quarterly payment on the purchase price, with respect to which both Lyons and JRC were jointly and severally liable.

Lyons and JRC filed Chapter 11 bankruptcy proceedings on October 19,1990, in Erie, Pennsylvania. The Teamsters Fund sent a letter to Lyons on November 7, 1990, advising Lyons that there may be some withdrawal liability. At the Teamsters Fund Board of Trustees meeting on November 26, 1990, the board discussed Lyons and authorized its executive administrator to request from Price Waterhouse the withdrawal liabililty for Lyons and to file on behalf of the fund a withdrawal liability claim against Lyons should it be determined by Price Waterhouse that a claim exists. The Teamsters Fund sent a letter to Lyons on December 11, 1990, assessing withdrawal liability against Lyons in the amount of $1,606,605.

Less than a month later, the Teamsters Fund sent a demand letter to Sherwin–Williams demanding that it pay the withdrawal liability assessed against Lyons with respect to Lyons' withdrawal from the Fund on the theory that it had been a principal purpose of Sherwin–Williams in selling Lyons' stock to evade or avoid withdrawal liability.

On March 7, 1991, Sherwin–Williams requested that the Teamsters Fund reconsider its determination that a principal purpose of Sherwin–Williams sale of Lyons' stock was to evade or avoid withdrawal liability and also asserted that the Fund's computations of withdrawal liability were incorrect and requested that the computations be reviewed.

The Teamsters Fund notified Sherwin–Williams on May 13, 1991, that it had reviewed Sherwin–Williams' requests for review and had not changed its position that a principal purpose of the sale was to evade or avoid withdrawal liability. The Fund also stated that its computations of withdrawal

liability and its acturial assumptions complied with MPPAA.

Sherwin–Williams filed a supplement to its request for review with the Fund on July 3, 1991, explaining in greater detail its position that the withdrawal liability had been calculated incorrectly. Counsel for Sherwin–Williams met with the Fund's counsel to discuss the calculations. On September 18, 1991, the Teamsters Fund notified Sherwin–Williams by letter that it had recalculated the Lyons withdrawal liability and determined that the appropriate liability was $477,270, as opposed to the $1,606,605 which it had originally calculated. In computing the withdrawal liability in its revised assessment, the Teamsters Fund included so–called "gap year interest," which is a year's interest from the December 31, 1989, determination date (as to the Teamsters fund's unfunded vested liabilities) to the assumed first payment date of January 1, 1991, in the amount of $35,795. While preserving its objections, Sherwin–Williams paid the Teamsters Fund for its withdrawal liability assessment in the amount of § 515,806.09.

Sherwin–Williams initiated arbitration on July 9, 1991, alleging two issues for resolution by the arbitrator. First, was the Teamsters Fund correct in determining that a principal purpose of Sherwin–Williams sale of Lyons' stock to evade or avoid withdrawal liability? Second, should the Teamsters Fund have included "gap year interest" in the amount of $35,795 in its final calculation of withdrawal liability?

The Arbitrator was selected by the parties in accordance with the Rules of the American Arbitration Association. The arbitration hearing was held over a four day period in October, 1993, in Cleveland, Ohio. Testimony and exhibits were admitted into evidence. The parties submitted pre–hearing and post–hearing briefs to the Arbitrator. The Arbitrator issued a 63 page Decision and Opinion on February 7, 1994, finding in favor of the Teamsters Fund on the first issue that the Teamsters Fund's determination that a principal purpose of Sherwin–Williams' sale of Lyons' stock was to evade or avoid withdrawal liability. The Arbitrator found in favor of Sherwin–Williams on the second issue con-

cluding that the Teamsters Fund should not have included "gap year interest" in its withdrawal liability calculation, and thus, Sherwin–Williams was entitled to a refund of § 35,795 plus interest.

Sherwin–Williams filed this action on March 8, 1994, pursuant to MPPAA, 29 U.S.C. § 1401(b)(2), requesting that this Court vacate the Arbitrator's principal purpose determination and find that a principal purpose was not to evade or avoid withdrawal liability and enforce the Arbitrator's decision that gap year interest' should not be included in the withdrawal liability calculation. The Teamsters Fund filed a counterclaim against Sherwin–Williams seeking enforcement of the Arbitrator's principal purpose determination and vacation of the Arbitrator's ruling regarding "gap year interest". The case was assigned to Judge Lesley B. Wells. Defendant filed a Motion to Dismiss the Complaint and to enforce in part the Arbitration Award. Plaintiff filed a Motion for Summary Judgment. Both parties filed briefs in support of their motions and in opposition to the other parties' motion. Sixteen binders of documents, transcript and exhibits from the arbitration proceeding were submitted in conjunction with the motions. The case was referred to Magistrate Jack B. Streepy for a Report and Recommendation on the pending motions by Judge Lesley B. Wells on February 17, 1995. The case was reassigned to this Court on July 12, 1995.

The Magistrate Judge issued his Report and Recommendation ("R & R") on February 29, 1996, recommending that the decision of the Arbitrator be enforced as to both he "gap year interest" and the imposition of withdrawal liability against Sherwin–Williams. Plaintiff filed a five page Summary of Objections to the R & R and a thirty–four page document titled "Objections to R & R" on March 14, 1996. Defendant filed a Response to Plaintiff's Summary of Objections on March 28, 1996. Plaintiff filed a Reply to Defendant's Response on April 3, 1996. Defendant filed another Response to Plaintiff's Objections to R & R on May 24, 1996. Plaintiff responded with another Reply in Support of its Objections to R & R on June 3, 1996.

Defendant filed a Responsive Brief and Plaintiff filed a Supplemental Brief to apprise Court of decision of the U.S. Court of Appeals for the 7th Circuit on July 19, 1996. On October 3, 1996, Plaintiff filed for leave to file an affidavit of Ron M. Tamburrino and exhibits in opposition to Defendant's Motion to Dismiss and in support of Plaintiff's Motion for Summary Judgment. Defendant filed a Response to Plaintiff's Motion to file affidavit in support of its Motion for Summary Judgment on November 25, 1996. Plaintiff filed a Reply to Defendant's Response on December 5, 1996. The case is now exhaustively briefed and ready for decision.

### Standard of Review for Magistrate Judge's Report and Recommendation

■ The applicable district court standard of review for a magistrate judge's Report and Recommendation depends upon whether objections were made to that Report. When objections are made to a Report and Recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R.CIV.P. 72(b) provides this standard of review; it states, in pertinent part, the following:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Accordingly, this Court will review the Reports and Recommendation, to which timely objections have been filed, *de novo. See Massey v. City Ferndale*, 7 F.3d 506 (6th Cir.1993).

### Standard of Review of Arbitrator's Award

It is important to note that the above standard of review for a Magistrate Judge's Report and Recommendation is distinct from the standard of review of an Arbitrator's ruling and award under MPPAA. A district court may not conduct a *de novo* review of the findings of fact made by the Arbitrator. MPPAA provides that upon completion of arbitration proceedings, any party thereto: "may bring an action in a federal district court to enforce, vacate, or modify an award." 29 U.S.C. § 1401(b)(2).

MPPAA further provides that:

> in any proceeding under subsection (b) *there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct.* 29 U.S.C. § 1401(c). (Emphasis added.)

Courts have interpreted the statutory presumption in favor of the arbitrator with respect to his findings of fact to require a district court to review those findings based on the "clearly erroneous" standard. *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994 (7th Cir. 1993), *Aff'd*, 513 U.S. 414, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995). "Clearly erroneous" means that the reviewing court has a definite and firm conviction that a mistake has been committed. *Concrete Pipe and Products v. Construction Laborers Pension Trust*, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Santa Fe Pacific Corp. v. Central States Pension Fund*, 22 F.3d 725, 727 (7th Cir.), *cert denied*, 513 U.S. 987, 115 S.Ct. 483, 130 L.Ed.2d 396 (1994.) ("A finding is clearly erroneous if the reviewing court, after duly acknowledging the superior proximity of the fact finder to the witnesses, is firmly convinced that the finding is erroneous.")

■ Under the clearly erroneous standard of review, a court may not reverse the fact–finder's decision, even if it might come to a different conclusion, if the fact–finder's account of the evidence is plausible in light of the record viewed in its entirety. *See, Anderson v. Bessemer*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). The question for the reviewing court is not whether it concurs with the arbitrator's decision but instead whether, on the entire record, it is left with the definite and firm conviction that a mistake has been committed. *Zenith Radio Corp. v. Hazeltine Re-*

*search, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

■ While factual findings of the arbitrator are presumed to be correct, the court is to review the arbitrator's conclusions of law *de novo. Trustees of Amalgamated Ins. Fund v. Geltman Industries, Inc.,* 784 F.2d 926 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986).

MPPAA contains no explicit standard of review for mixed questions of law and fact. While courts differ on the correct standard of review of mixed questions of fact and law, the better reasoning supports the position that mixed questions of fact and law fall under the clearly erroneous standard of review. *Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co.,* 890 F.2d 1405, 1410–11 (7th Cir.1989); *Jos. Schlitz Brewery Co.,* 3 F.3d 994 (The dominant theme in MPPAA's resolution process is deference to the person who hears the evidence. Thus, an arbitrator's decision on mixed questions of fact and law may be set aside only for clear error.)

■ In *Chicago Truck Drivers Pension Fund,* the Seventh Circuit analyzed the appropriate standard of review for mixed questions of fact and law and determined that in light of MPPAA's strong policy favoring arbitration of withdrawal liability disputes, great deference must be given to an arbitrator's determinations. This is particularly true on the issue of whether a principal purpose of a transaction was to evade or avoid withdrawal liability, where the arbitrator's fact finding and pension law expertise can contribute significantly to a decision. *Chicago Truck Drivers Pension Fund,* 890 F.2d 1405, 1410–11. Thus, mixed questions of fact and law, such as the issue of whether a principal purpose of a transaction was to evade or avoid withdrawal liability, must be reviewed under a clearly erroneous standard. *Id.*

■■ Accordingly, this Court will review the Arbitrator's decision with respect to the issue of "whether a principal purpose of Plaintiff's sale of Lyons' stock was to evade or avoid withdrawal liability" under a clearly erroneous standard. The Arbitrator's decision regarding "gap year interest" is a question of law and thus will be reviewed *de novo.*

**I. Principal purpose to evade or avoid withdrawal liability**

MPPAA was designed to prevent employers from withdrawing from multiemployer pension plans without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans. *Manufacturers' Indus. Relations Ass'n v. East Akron Casting Co.,* 58 F.3d 204 (6th Cir.1995). Specifically, 29 U.S.C. § 1381(a) provides:

If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

Moreover, MPPAA further provides that:

*If principal purpose of any transaction is to evade or avoid liability* under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

29 U.S.C. § 1392(c) (emphasis supplied). Thus, Sherwin–Williams is liable for Lyons' complete withdrawal from the Teamsters Fund and the ensuing withdrawal liability assessed against Lyons, if a principal purpose of its sale of the stock of Lyons to JRC was to evade or avoid withdrawal liability.

■ The Arbitrator, after listening to all the testimony and reviewing all the records, exhibits and briefs, determined that while evasion of withdrawal liability was not the principal purpose for the Lyons transaction, there were legitimate business reasons to support it; the avoidance of $7,000,000 in possible withdrawal liability was a principal purpose in the transaction. The Magistrate Judge, after examining the record before the Arbitrator and the parties' briefs and exhibits, agreed that the Arbitrator's finding that a principal purpose of the Lyons' transaction was to evade or avoid withdrawal liability was not clearly erroneous. This Court concurs.

Sherwin–Williams has submitted several objections to the Magistrate Judge's R & R. First, Plaintiff asserts that the Arbitrator applied the wrong standard of review and

burden of proof. Sherwin–Williams contends that the Arbitrator's decision that the dispute could be resolved by the evidence presented at the hearing without reliance on the statutory presumptions contained in 29 U.S.C. § 1401(a)(3)(A) actually created a higher burden than required by MPPAA. Under 29 U.S.C. § 1401(a)(3)(A), the Teamsters Fund's determination that a principal purpose of Sherwin–Williams' sale of Lyons stock was to evade or avoid withdrawal liability "is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous."

Plaintiff claims that it met the required burden of proof under 29 U.S.C. § 1401(a)(3)(A) as interpreted by the Supreme Court in *Concrete Pipe and Products of California, Inc.,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). The Arbitrator did not attempt to dispute the requirements of 29 U.S.C. § 1401(a)(3)(A) or *Concrete Pipe,* rather, he listened to the testimony and reviewed the evidence of both parties, and without reference to a presumption, determined that the evidence adduced by the Teamsters Fund in support of its determination that Plaintiff had a principal purpose to avoid withdrawal liability was stronger than the evidence presented by Plaintiff that it did not have such a principal purpose. Thus, the burden applied by the Arbitrator in this case was certainly not higher than the burden set forth in MPPAA; if anything, it was probably more favorable to Plaintiff.

Sherwin–Williams also objects that the Arbitrator's findings of fact were clearly erroneous. Specifically, Plaintiff contends that the Arbitrator improperly inferred proof of intent from proof of facts known to Plaintiff. The Arbitrator concluded that Sherwin–Williams had a principal purpose to avoid withdrawal liability upon finding that Sherwin–Williams knew nine fairs. Plaintiff objects that there is no credible evidence supporting four of the nine factors

Two of the factors considered by the Arbitrator concerned the economic viability of Lyons. The Arbitrator determined based on the evidence presented to him that (a) Lyons could not survive without someone underwriting its monthly losses; and (b) that although Lyons may have been "solvents", it clearly was not an economically viable operation in mid-1990. Sherwin–Williams argues that it had no knowledge that Lyons was not economically viable. Despite its own history with Lyons, Sherwin–Williams argues that under new management Lyons could have survived independently without someone underwriting Lyons' monthly losses. Sherwin–Williams submitted several witnesses in the arbitration proceeding who claimed that Lyons could become successful eventually and that Lyons would enjoy increased sales and less losses. The Arbitrator listened carefully to these witnesses and determined their credibility and the value of their testimony. Given the nearly overwhelming past losses of Lyons and the failure of IRC to even make a dent in that losing history during its short duration as owner, the Arbitrator's factual findings regarding Lyon's economic viability are not clearly erroneous.

Next, Plaintiff argues that the Arbitrator's determination that "JRC was a shell corporation, also without economic viability" was clearly erroneous. The evidence submitted regarding the Lyons transaction reflects that IRC had no capital or financial backing and had to seek financing through an independent source. JRC sought financing from some 40 or more banks or real estate investors and could not obtain financing for its first offer of $7,850,000 cash for Lyons. When JRC informed Sherwin–Williams it could not obtain financing for the original deal, Plaintiff agreed to renegotiate the deal as a highly leveraged buy out for $ 1,600,00 cash, obtained through Allstate secured by Lyons' accounts receivables, and the remaining 6,250,000 payable over six years. Further, Plaintiff knew that Dunn and Bradstreet had no information regarding JRC in the state of New York, but did not investigate further. Finally, Plaintiff knew that JRC was not a wholly owned subsidiary of Common Bros. Inc. and thus, Common Bros. had no legal obligation to loan money to, or otherwise subsidize, JRC. Certainly, from the information available at the time of the hearing, it was not clearly erroneous for the

Arbitrator to find that JRC was a shell corporation.

Sherwin–Williams has submitted an affidavit of one of its attorneys attaching some financial records of Common Brothers, obtained by Plaintiff after the Arbitrator issued his Decision and Award and after the Magistrate Judge issued his R & R. The records purport to show some transfers of money from Common Brothers to LTL, which Plaintiff asserts is Lyons Transportation Lines. The financial documents were obtained by Sherwin–Williams through discovery in the course of Common Brothers' bankruptcy proceedings. Plaintiff asserts that this new evidence proves that JRC had Common Brothers' financial backing and thus was not a shell corporation. The financial records do not prove that JRC (or Lyons) was a subsidiary of Common Brothers or that Common Brothers had any legal obligation to support or sustain JRC. At most the records reflect that there may have been some basis for Sherwin–Williams' hope that Common Brothers would help back-up JRC if it needed support.[1] This evidence is insufficient to support Plaintiff's claim that it did not know or believe that JRC was not economically viable, when it was clear at the time of the transaction that JRC was not a wholly owned subsidiary of Common Brothers and that Common Brothers could not be involved in the transaction. Accordingly, even with Plaintiff's new evidence, the Arbitrator's finding regarding JRC's economic viability is not clearly erroneous.

Finally, Plaintiff asserts that the Arbitrator's findings with respect to the final two factors are not supported by the evidence. The Arbitrator's final two findings were:

(d) that once the transaction was recast from $7,850,000 cash at closing to $1,600,000 down and the balance over six years and secured by Lyons' assets, in view of the problems in the industry, the monthly losses of Lyons as an operating entity and the shell nature of IRC, it was unlikely that Sherwin–Williams would ever receive more than § 1,600,000 or so cash for Lyons; and

(e) that $1,600,000 cash plus avoidance of $7,000,000 of contingent employer withdrawal liability made $8,600,000, the consideration Sherwin–Williams deemed a fair price for Lyons. (If there was a miracle on Lake Erie and Sherwin–Williams received the $7,850,000 plus the employer withdrawal liability relief of $7,000,000, it got all its money back——unlikely as that seemed.)

Arbitrator's Decision and Opinion at 62. Sherwin–Williams argues that there is no evidence that it "knew" it would never receive more than $1,600,000 cash for Lyons, especially in light of the fact that it turned down or failed to pursue other offers for Lyons which would pay more cash. The Arbitrator was aware of the other offers and drew his conclusions regarding the value of these offers during the course of the evidentiary hearing. The fact that the Arbitrator made the disputed finding despite the existence of those other offers does not make the findings clearly erroneous.

Similarly, Plaintiff argues that it was unreasonable to find that Sherwin–Williams deemed $1,600,000 cash plus the avoidance of § 7,000,000 of contingent withdrawal liability a fair price for Lyons. Again Plaintiff refers to its other offers for Lyons and the fact that the actual withdrawal liability for all three funds Lyons contributed to was less than $7,000,000. The Arbitrator reviewed all of the evidence, listened to four days of testimony and concluded that given Lyons' continuing significant monthly losses and lack of economic viability, JRC's lack of capital or financial assets and its failure to obtain significant financing along with the downturn in the trucking industry in general it was likely

---

1. Defendant objects to the introduction of new evidence at this point of the process, as this Court is functioning as a reviewing court and not as a fact–finder. Defendant asserts that MPPAA intends the sole fact finder to be the arbitrator, not the reviewing court. Moreover, even if MPPAA permitted this Court to review new evidence, Defendant argues that Plaintiff has not met the standard for the admission of new evidence set by Fed.R.Civ.P. 60(b). Defendant's objections are well taken; however, to ensure completeness and to avoid any potential future issue, the Court has reviewed the new evidence and has determined that it would not change the Arbitrator's decision.

that even if Lyons managed to scrape by month to month, it would not be in a position to pay its debt to Plaintiff. That finding is not unreasonable much less clearly erroneous.

The Arbitrator's finding that a principal purpose of the Lyons' transaction was to evade or avoid withdrawal liability is not clearly erroneous. Accordingly, the Magistrate Judge's recommendation that the Arbitrator's "principal purpose" finding be affirmed is adopted.

## II. Arbitrator Bias Violated Due Process

■ Sherwin–Williams contends that the Arbitrator was predisposed to find that Sherwin–Williams had the intent to evade or avoid withdrawal liability thus depriving Sherwin–Williams of due process. Plaintiff points to two statements in the Arbitrator's Decision:

> [Withdrawal liability] may be considered— and if the truth be known, is always known and considered (or, at least, should be known and considered)—by competent corporate executives and benefits counsel. Arbitrator's *Decision* and Opinion at 60.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> [O]nce you realize that Sherwin–Williams is a Fortune 200 company, with knowledgeable experts and personnel and a $ 7 million issue, you now it was a factor and, in the overall context, "a principal purpose" to be rid of the Title IV liability. Arbitrator's Decision and Opinion at 63.

These limited passages taken out of context do not demonstrate that the Arbitrator prejudged the case. Plaintiff states that although the first statement at page 60 of the Arbitrator's Decision was made in the context that "mere consideration [of withdrawal liability] is not a principal purpose, per se", Sherwin–Williams contends that its argument, made at the hearing, that it never considered withdrawal liability at all, never had a chance. That is not the case. The Arbitrator heard and considered all of Sherwin–Williams' testimony and argument during the hearing. It was his role to determine the credibility of the testimony and the value of the evidence he heard. He made those

judgments and made his findings based upon the evidence and the law. There is nothing in these two statements to show that the Arbitrator had prejudged the withdrawal liability issue.

Plaintiff also contends that the Arbitrator did not give sufficient weight to the testimony of some of its witnesses regarding the ability of IRC to turn Lyons around. The Arbitrator's failure to give the appropriate amount of credibility and weight to this testimony demonstrates the Arbitrator's "poisoned view of the facts." Plaintiff's Objections at 27. Again, it is the function of the arbitrator under the system set up by Congress in MPPAA to weigh the credibility of witnesses and determine the appropriate weight afforded each piece of evidence and testimony. The Arbitrator fulfilled this function according to the standards set forth in MPPAA. It is not for this Court to second guess the Arbitrator's first hand impressions of credibility and weight of the evidence. As the Magistrate Judge determined, Plaintiff has not established any due process violation.

## III. Gap Year Interest

The Teamsters Fund seeks to vacate that portion of the Arbitrator's Decision which found that the Teamsters Fund should not have assessed "gap year" interest in the amount of $35,795 against Plaintiff. As the Magistrate Judge correctly noted, the Arbitrator's decision that MPPAA does not permit assessment of gap year interest was confirmed by the Supreme Court in *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 115 S.Ct. 981 (1995).

### Conclusion

For the reasons stated, the Report and Recommendation of the Magistrate Judge (Document # 45) is ADOPTED and Plaintiff's Motion for Summary Judgment is DENIED IN PART with respect to the Arbitrator's affirmation of the assessment of withdrawal liability against Plaintiff, and GRANTED IN PART with respect to Plaintiff's request to enforce the Arbitrator's Decision regarding gap year interest. Defendant's Motion to Dismiss the Complaint is GRANTED IN PART with respect to the issue of withdrawal liability and DENIED

IN PART with respect to gap year interest. The Arbitrator's Decision and Opinion is AFFIRMED in its entirety.

IT IS SO ORDERED.

## JUDGMENT ENTRY

Pursuant to a Memorandum of Opinion and Order of this Court, Plaintiff's Motion for Summary Judgment (Document # 21) is DENIED IN PART with respect to the Arbitrator's affirmation of the assessment of withdrawal liability against Plaintiff, and GRANTED IN PART with respect to Plaintiff's request to enforce the Arbitrator's Decision regarding gap year interest. Defendant's Motion to Dismiss the Complaint (Document # 20) is GRANTED IN PART with respect to the issue of withdrawal liability and DENIED IN PART with respect to gap year interest.

The Report and Recommendation of the Magistrate Judge (Document # 45) is ADOPTED and the decision of the Arbitrator is AFFIRMED.

IT IS SO ORDERED.