**SOUTHWEST WHEY, INC., a corporation, Plaintiff/Counter–Defendant,**

v.

**NUTRITION 101, INC., an Illinois corporation, Defendant/Counter–Plaintiff.**

No. 98–3217.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 21, 2001.

D. Bradley Blodgett, Hinshaw & Culbertson, Springfield, IL, Mark C. Metzger, Hinshaw & Culbertson, Lisle, IL, for Plaintiff.

Thomas H. Wilson, David A. Rolf, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., Springfield, IL, for Defendant.

## OPINION

RICHARD MILLS, District Judge.

Hopefully, this will be the final chapter in the "Whey Saga."

This has been a long, complex and tortured case involving two very able, but strong-willed and rigid, corporate presidents who personally drew up a partnership contract.

The real moral to this painful and costly episode is to have an *attorney* draft a legal document of such magnitude!

With everything factored in, the bottom line is this: Southwest Whey receives $338,407.68 and Nutrition 101 gets $293,521.50.

## I. BACKGROUND

The detailed factual backdrop of this case can be found in two previous Opinions of this Court. *See Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770 (C.D.Ill.2000); *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 126 F.Supp.2d 1143 (C.D.Ill.2001). The litigation in this case was initiated by Southwest Whey, whose claims for breach of contract, breach of fiduciary duty and conversion were determined by a jury. Nutrition 101 also had several claims decided by the jury. These included claims for breach of contract, breach of fiduciary duty and interference with prospective business advantage.

The jury found for Nutrition 101 on Southwest Whey's breach of contract count. It found for Southwest Whey on its breach of fiduciary duty count, assessing damages in the amount of $18,464.00. The jury also found for Southwest Whey on its conversion count, assessing damages in the amount of $83,877.02. The jury assessed punitive damages against Nutrition 101 in the amount of $300,000.00.

As for Nutrition 101's claims, the jury found for Southwest Whey on the breach of contract and interference with prospective business advantage counts. The jury found for Nutrition 101 on its breach of fiduciary duty count, assessing damages in the amount of $74,503.41. Moreover, the jury assessed punitive damages against Southwest Whey in the amount of $20,000.00. Nutrition 101 also seeks an accounting and equitable division of the joint venture assets following dissolution. Being equitable relief, the accounting counterclaim was heard at bench. On May 30, 1989, Southwest Whey and Nutrition 101 entered into a written agreement to operate a joint venture. Southwest Whey would procure whey from dairies while Nutrition 101 would market whey to hog farmers in the region east of the Mississippi River and in other areas by mutual agreement. The president of Southwest Whey is Jack Muse. Prior to the joint venture, Mr. Muse had been procuring whey from dairies and selling it to livestock producers for about a decade. His business was limited primarily to Arizona, Colorado, Nebraska and Utah. The president of Nutrition 101 is Ross Peter. Mr. Peter had experience in marketing feed to farmers and an established customer base prior to the joint venture. Pursuant to the joint venture agreement, the parties

agreed to equally divide all revenue over the cost of freight, installation, costs and miscellaneous expenses relating to mechanical problems, and profits from the joint venture. The agreement called for Nutrition 101 to provide accounting services.

Eventually, conflict arose between Southwest Whey and Nutrition 101. It was clear by November 1992 that there were serious differences between the parties. It was then that Southwest Whey sent Nutrition 101 a letter suggesting that the parties consider shutting down the business. In January 1993, the parties discussed a proposed buy-sell agreement to dissolve and wind up the joint venture. Apparently, there were other similar discussions prior to and after the joint venture was dissolved. But, the parties failed to reach agreement on any of the proposed buy-sell arrangements.

On September 16, 1993, Southwest Whey sent a written notice of dissolution to Nutrition 101 indicating that it had decided to cease operations as a joint venture, and that Nutrition 101 would no longer be allowed to access whey from the dairies. One month later, Southwest Whey sent letters to all customers advising them of the dispute between the parties and soliciting the customers to do business with Southwest Whey. Nutrition 101 also contacted most, if not all, of the customers.

There are three parts to Nutrition 101's counterclaim for an accounting: (1) an accounting of the operations during the joint venture; (2) a valuation of the contracts; and (3) a division of the Raskas settlement proceeds.

This final part concerns a contract entered into with Raskas Foods, Inc. in 1991. In 1992, Raskas terminated the contract. In 1995, Southwest Whey filed suit in the St. Louis County Circuit Court against Raskas for breach of contract and various other claims. Nutrition 101 attempted to intervene in that suit as a co-plaintiff. The litigation between Raskas and Southwest Whey was settled for $450,000.00. It was determined that the division of those funds would be decided in this action. The settlement has been paid and is currently in one of Attorney David Danis' bank accounts. Mr. Danis represented Mr. Muse in the Raskas litigation.

## II. ANALYSIS

### A. Illinois Partnership Law

Nutrition 101's counterclaim is governed by Illinois Partnership Law. Illinois has adopted the Uniform Partnership Act. *See* 805 ILCS 205/1. Partnership property is identified in pertinent part as "[a]ll property originally brought into the partnership stock or subsequently acquired, by purchase or otherwise, on account of the partnership." 805 ILCS 205/8. Moreover, "[u]nless the contrary intention appears, property acquired with partnership funds is partnership property." *Id.* "The property rights of a partner are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management." 805 ILCS 205/24. Section 25 identifies the rights of the partners to the partnership property:

(1) A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership.

(2) The incidents of this tenancy are such that:

(a) A partner, subject to the provisions of this Act and to any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners.

805 ILCS 205/25

"A partner's interest in the partnership is his share of the profits and surplus, and

the same is personal property." 805 ILCS 205/26.

Section 29 defines dissolution of the partnership. Specifically, "[t]he dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." 805 ILCS 205/29. "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." 805 ILCS 205/30.

Section 40 addresses the settling of accounts between partners following dissolution. That section provides in relevant part:

In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

(a) The assets of the partnership are:

I. The partnership property,

II. The contributions of the partners necessary for the payment of all the liabilities specified in clause (b) of this paragraph.

(b) The liabilities of the partnership shall rank in order of payment, as follows:

I. Those owing to creditors other than partners,

II. Those owing to partners other than for capital and profits,

III. Those owing to partners in respect of capital,

IV. Those owing to partners in respect of profits.

(c) The assets shall be applied in the order of their declaration in clause (a) of this paragraph to the satisfaction of the liabilities.

805 ILCS 205/40.

"The right to an account of his interest shall accrue to any partner . . . as against the winding up partners . . . or the person or partnership continuing the business, at the date of dissolution, in the absence of any agreement to the contrary." 805 ILCS 205/43. The parties' joint venture agreement did not provide a process for an accounting. Accordingly, the accounting is governed by Illinois Partnership Law.

### B. Accounting of Operations During Joint Venture

The first part of Nutrition 101's counterclaim is an accounting of operations during the joint venture. Nutrition 101 notes that the jury's verdict on Southwest Whey's conversion count has some effect on this portion of its counterclaim.

The jury itemized its verdict in arriving at the figure of $83,877.02 on the Southwest Whey's conversion count. Specifically, it found that Southwest Whey was entitled to (1) $102,492.43 in unpaid margins; (2) $11,470.27 in unpaid tank fees;[1] (3) $4,455.89 for the Nauvoo farm tank; and (4) $4,017.52 for the Pinkerton farm tank. The total amount was $122,436.11. The jury determined that the total agreed expenses of $35,797.24 should be withheld, resulting in a figure of $86,638.87. The jury then deducted various expenses owed by Southwest Whey: (1) $533.35 in legal expenses; (2) $100.00 in cash flow study; (3) $1793.00 in equipment and metering devices; and (4) $336.25 in expenses for Randy Peter.[2] These expenses totaled

---

1. Southwest Whey and Nutrition 101 each purchased various tanks that would be placed on farms and used by a customer to enhance whey sales for the benefit of the joint venture. The amount here is what Southwest Whey is entitled to recover for its investment in the tanks.

2. Randy Peter is Ross Peter's cousin.

$2,762.60 and were deducted from $86,638.87. The jury therefore determined that Southwest Whey was entitled to $83,877.02 on its conversion count.

■ Nutrition 101 correctly notes that the jury's award on the conversion count went farther than allowed under Illinois law. Specifically, the object of conversion must be a specific chattel of which a party was wrongfully deprived. *See In re Thebus,* 108 Ill.2d 255, 260, 483 N.E.2d 1258, 91 Ill.Dec. 623 (1985); *Mid–America Fire & Marine Insurance Co. v. Middleton,* 127 Ill.App.3d 887, 892, 468 N.E.2d 1335, 82 Ill.Dec. 555 (4th Dist.1984). Although money may be a subject of conversion if described as a specific chattel, an action for conversion of funds does not lie to satisfy a mere obligation to pay money. *See Thebus,* 108 Ill.2d at 260, 91 Ill.Dec. 623, 483 N.E.2d 1258. Because the jury's verdict included what constituted a debt, the Court will adjust the verdict and incorporate the balance of the jury's findings into the accounting counterclaim. The jury determined that Southwest Whey was entitled to (1) $11,470.27 for unpaid tank fees; (2) $4,455.89 for the Nauvoo tank; and (3) $4,017.52 for the Pinkerton tank. This yields a total figure of $19,943.68. The Court will therefore adjust the jury's verdict of $83,877.02 on the conversion count to $19,943.68. The Court will consider the jury's findings regarding the debts and other expenses in determining the first part of the accounting action.

The jury concluded that Southwest Whey was due $102,492.43 from Nutrition 101 for unpaid margins. The jury determined that the balance due Nutrition 101 from Southwest Whey for various expenses amounted to $38,559.84.[3] The difference in these two figures is $63,932.59, which is due to Southwest Whey in the accounting portion during the joint venture.

■ Nutrition 101 asserts that it is entitled to additional funds. Nutrition 101 maintains that it is owed $27,933.99 to equalize the tank ledgers.[4] Nutrition 101 arrives at this figure by determining the difference in each company's tank ledger and dividing that number in half. Specifically, Nutrition 101's ending tank ledger was $61,395.88 with Southwest Whey's at $5,527.90, a difference of $55,867.98. Nutrition 101 therefore asserts that it is due half of this total—$27,933.99—in order to equalize the tank ledgers. Southwest Whey disputes this assertion, arguing that it never accepted the tank ledger accounting approach. Moreover, it notes that the contract is silent as to equalization. Southwest Whey's expert, Michael Lewis, opined that the tanks are assets of Southwest Whey and Nutrition 101 separately, each company owning the tanks that it purchased. Finally, Southwest Whey asserts that the jury's itemized verdict form clearly demonstrates that it rejected Nutrition 101's tank ledger claims and that this Court should not now revisit them.

The Court finds that Nutrition 101 is entitled to equalize the tank ledgers. Initially, the Court notes that paragraph ten

---

**3.** The total of $38,559.84 due Nutrition 101 results from the following expenses determined by the jury: (1) $35,797.24 in conceded expenses; (2) $533.35 in legal expenses; (3) $100.00 in cash flow; (4) $1793.00 in equipment and metering expenses; and (5) $336.25 in expenses for Randy Peter.

**4.** Each party funded various tanks for the joint venture. Nutrition 101 created a tank ledger for each company that was used to track tank investment. Interest was added at one percent (1%) of the previous month's balance for each company's ledger. Payments were subtracted against the balance remaining on each company's tank ledger. Southwest Whey asserts that it never accepted the tank ledger accounting approach.

of the joint venture agreement called for Southwest Whey to order tanks. Moreover, paragraph eleven indicated that Nutrition 101 would pay Southwest Whey interest on the tanks. In reality, however, both parties purchased tanks that were set on farms.[5] Paragraph twelve of the agreement provided that "[a]ll revenue over the cost of freight, installation costs and misc. expenses relating to mechanical problems will be equally divided between SW and 101." Tanks could therefore be categorized as "installation costs" that were to be divided equally.

Southwest Whey suggests that there is no basis for equalizing the tank ledgers. However, although the tanks were placed on the farms by one company or the other, they were put there for the benefit of the joint venture. As Mr. Lewis noted, "the tanks were purchased by one of the parties and used by a joint venture customer." Mr. Lewis further indicated that each party was entitled to a return on its investment and interest thereon and that this would properly be addressed in a winding up of the venture. Each party therefore received an economic benefit. Southwest Whey is correct that the contract is silent as to equalizing tank ledgers. However, the contract is silent as to many things. The bottom line is that each party provided tanks for the joint venture which were used by the parties to perform their primary obligations under the joint venture contract. It is therefore only equitable that the ledgers be equalized.

The Court therefore finds that Nutrition 101 is entitled to $27,933.99 to equalize the tank ledgers prior to dissolution.

Nutrition 101 also maintains that it is due $3,717.49 which it asserts represents one-half of the customer credits that it gave during the joint venture. Apparently, these credits were given primarily for a spoiled or spilled product. Southwest Whey correctly notes that there is no specific part of the contract that addresses credits for a spoiled product. However, as the Court earlier noted, the one page document that guided the joint venture did not address every conceivable situation that might arise. The agreement did provide that the parties would divide the revenue equally. While it is true that Nutrition 101 dealt primarily with the customers, the spoilage of the product would appear to be a cost which is directly associated with the revenue generated by the enterprise. Accordingly, it is only logical that both parties bear this expense.

The Court therefore finds that Nutrition 101 is entitled to $3,717.49 which represents one-half of credits given to customers of the joint venture.

Nutrition 101 next contends that it is entitled to $2,522.67 which represents one-half of the plant fees received by Southwest Whey from Jaeggie Dairy during the life of the joint venture. Southwest Whey does not dispute this amount, arguing only that it would be inappropriate to require it to pay that sum to Nutrition 101 because it has not yet received the revenue. The purpose of this action is to square the accounts between the two joint venturers. However, it would be inequitable to require Southwest Whey to pay Nutrition 101 funds which it has not yet received. Therefore, this amount will not become due until Southwest Whey receives it from Jaeggie Dairy. Nevertheless, the Court will include this amount in determining the accounting. Nutrition 101 should receive one-half of the Jaeggie plant revenue when it is paid to Southwest Whey.

---

**5.** Some tanks were sold directly to the farmers. However, some farmers did not want their own tanks. In those instances, either Southwest Whey or Nutrition 101 would provide tanks.

The Court therefore finds that Nutrition 101 is entitled to $2,522.67 which represents one-half of the plant fees received by Southwest Whey from Jaeggie Dairy during the joint venture. This amount will become due when received by Southwest Whey.

Nutrition 101 next maintains that it is entitled to $6,276.53 to equalize the residual value of the tanks. Jay Buck, Nutrition 101's expert, identified the residual value of the tank as the tank itself—the steel. This contrasts with the ledger balances which kept track of the investment or advances that each company made in acquiring the tanks. Thus, this is the difference in the value of the tanks at the end of the venture. Nutrition 101 maintains that the ending residual value of Southwest Whey's tanks was $22,835.19 whereas the ending residual value of its own tanks was $10,282.14 for a difference of $12,553.05. Nutrition 101 asserts that it is entitled to one-half of the difference.

Southwest Whey makes no new argument about the residual value of the tanks. Presumably, this is because it is Southwest Whey's contention that the tanks are assets of the two companies separately with each company owning those that it purchased. In determining that the tank ledgers should be equalized, the Court has already noted that the tanks were instrumental in enabling each party to perform its primary obligation under the contract. The same rationale applies here. The tanks assisted Southwest Whey in procuring and Nutrition 101 in marketing the whey. This was the heart of the joint venture business. The tanks were clearly used to advance the joint venture. A final accounting of the residual value of the tanks is therefore necessary.

The Court therefore finds that Nutrition 101 is entitled to $6,276.53 which represents one-half of the difference in the residual value of the tanks.

It is now necessary to add the amounts determined to be due Nutrition 101 and deduct that from the amount to which Southwest Whey is entitled. After adjusting the jury's verdict on Southwest Whey's conversion count from $83,877.02 to $19,943.68, the Court found that Southwest Whey was due $63,932.59 in the accounting of operations during the joint venture. Nutrition 101 is entitled to the addition of the following figures: (1) $27,933.99 to equalize the tank ledgers; (2) $3,717.49 in joint venture customer credits; (3) $2,522.67 in Jaeggie revenue due the joint venture; and (4) $6,276.53 to equalize the residual value of tanks. This results in a total of $40,450.68. The difference between this figure and the $63,932.59 owed to Southwest Whey in the accounting during the joint venture is $23,481.91.

After considering the jury's itemized findings on the conversion count, the Court finds that Southwest Whey is entitled to $23,481.91 [6] in the accounting during the joint venture. The jury's verdict on Southwest Whey's conversion count is hereby adjusted from $83,877.02 to $19,943.68.

### C. Accounting Since Dissolution

 The second part of the accounting is the major source of dispute between the parties in this action. Nutrition 101 asserts that a final accounting of the assets of the joint venture results in it being

---

**6.** This figure includes the $2,522.67 in Jaeggie plant revenue to which Nutrition 101 is entitled which has apparently not yet been paid to Southwest Whey. If Southwest Whey does not receive these funds from Jaeggie Dairy, then it will not have to account to Nutrition 101 for that amount. Southwest Whey would then be entitled to $26,004.58 in the accounting of operations during the joint venture.

owed $917,800.00. Southwest Whey maintains that Nutrition 101 is entitled to nothing more than has already been awarded by the jury in its breach of fiduciary duty counterclaim. The jury determined that Nutrition 101 was entitled to $74,503.41 because of Southwest Whey's breach of fiduciary duty.[7] The jury found that in soliciting prior to dissolution the continued business of joint venture customers after dissolution, Southwest Whey had breached its fiduciary duty to Nutrition 101.

Nutrition 101 bases its argument on a valuation of the contracts done by Mr. Buck. The parties' agreement did not contain any terms pertaining to dissolution of the joint venture. It is Nutrition 101's assertion that Southwest Whey dissolved the joint venture and continued to operate the business without a final accounting or division of the assets as is required for the winding up of the venture. Therefore, Mr. Buck calculated damages to determine the final accounting and division of assets for the interest owned by Nutrition 101 in the joint venture.

It is Nutrition 101's position that the assets of the joint venture included contracts with farm customers and dairies.[8] In order for the parties to fulfill their obligations pursuant to the agreement, the business required the combination of both a supply of whey from dairies and farm usage of the whey by the farm customers. Nutrition 101 therefore attempted to determine the value of the joint venture assets (farm customers and dairies) by combining the margins earned by each company from these assets since dissolution on September 16, 1993. Nutrition 101 then broke the damages down into two separate categories based on the alleged acts of Southwest Whey. The *first* is Nutrition 101's lost profits from October 1993 to October 2000. The *second* category of damages is Nutrition 101's future lost profits resulting from Southwest Whey's continued control of the joint venture assets without an equitable division.

Initially, Mr. Buck added the margins earned by Southwest Whey and Nutrition 101 for the period of October 1993 through September 2000 from the farm customers and dairies that the joint venture had served. This resulted in a combined margin figure for both companies of $1,671,333.00.[9] Nutrition 101 argues that because the agreement provided for a fifty percent split of revenues, each company would have received $835,666.00. Each year, Southwest Whey received more than one-half share of total margins from farm customers and dairies served by the joint venture. Hence, Mr. Buck determined that Nutrition 101 was due margins from joint venture customers received by Southwest Whey in each year since the joint venture terminated in 1993. Mr. Buck concluded that Nutrition 101 was due whatever amount Southwest Whey received in excess of its one-half share for a particular year and determined that Nutrition 101 was due $484,511.00 in order to equalize the margins. By October 1, 2000, the value of the margin shortfall was $593,523.00.

Nutrition 101 maintains that it is also entitled to future lost profits resulting from a division of the joint venture assets. Each company would have received one-half of the assets in the final accounting

---

7. The jury also assessed punitive damages against Southwest Whey in the amount of $20,000.00.

8. In determining damages, Nutrition 101 reviewed the following contracts with dairies: (1) Prairie Farms Dairy, Inc.-Quincy; (2) Al-

len Dairy Products; (3)Dean Foods Co.; (4) Jaeggie–Hillsdale Country Cheese; (5) Graham Cheese Corp.; and (6) Berne Cheese Co.

9. Southwest Whey's combined margins for this time period were $1,320,181.00 whereas Nutrition 101's were $351,161.00.

for the joint venture. Because no such division took place, Nutrition 101 attempted to equitably divide the value of the assets as they currently exist. Mr. Buck therefore valued the contracts using the current margins for each company. He assumed that each company would continue to earn margins equal to the monthly figure for 1999 through October 1, 2000. The time period used was from November 2000 through 2010. A perpetuity factor was also employed. Mr. Buck added each company's margin together to obtain a projected combined margin for the ten-year period. The projected margins are then totaled and divided in half. Mr. Buck concluded that Nutrition 101 was due $324,277.00. This figure represents Nutrition 101's lost profits as a result of Southwest Whey's failure to participate in a final accounting and division of the joint venture assets.

Nutrition 101 therefore asserts that a final accounting of assets and total valuation of joint venture assets results in it being owed $917,800.00.

As the Court earlier noted, the parties are far apart in terms of what a final accounting would yield. It is Nutrition 101's position that Mr. Buck's valuation of the contracts is based on what should have happened at dissolution—a division of the assets of the joint venture. If such a division had occurred, each party would have received half of the assets in some manner. The contracts were to provide the farmer with whey or to dispose of the whey from the dairy and were assets of the joint venture.

Nutrition 101 contends that the parties recognized Mr. Buck's income method during the course of the joint venture. Nutrition 101 notes that when buy-sell negotiations commenced in January 1993, the parties negotiated a $300,000.00 price based on the volume of whey, recognizing the potential revenue in the future. Nu-

trition 101 maintains that Southwest Whey came up with at least two proposals, one of which required Nutrition 101 to transfer its "interest in and to the assets of the joint venture." Moreover, that proposal required Mr. Peter to renew the account with Pinkerton farms. The contract with the farmer was therefore an asset which Southwest Whey wanted in place before purchasing Nutrition 101's interest in the joint venture assets. Nutrition 101 further notes that the proposal negotiated by the parties required the execution of documents, including "assignment of contracts ... to effectuate sole ownership of all properties presently held in the joint venture to Southwest Whey." Nutrition 101 contends that this is tantamount to an admission by Southwest Whey that the contracts with farmers and dairies were in fact assets of the joint venture. That proposal called for Southwest Whey to pay Nutrition 101 $260,000.00 which represented a sliding percentage of the gross margins for three years following the termination of the joint venture. Southwest Whey's second proposal was to apply Illinois partnership law if the parties could not otherwise agree on how to end the joint venture.

Nutrition 101 notes that Mr. Lewis has provided only three criticisms of Mr. Buck's analysis. The first criticism offered by Mr. Lewis was the length of time or duration that Mr. Buck projected the income for purposes of valuing the contracts. Nutrition 101 indicates that this is the same time period used by Mr. Lewis in the course of other litigation. Moreover, Nutrition 101 contends that this is a reasonable time period and provides a fair value of the contracts. Nutrition 101 asserts that the contracts are partnership property and partners who continue to use partnership property must account to their partners for the revenue therefrom.

The basis of this is the Illinois Supreme Court's decision in *Thanos v. Thanos*, 313 Ill. 499, 145 N.E. 250 (1924). That case involved two brothers involved in the restaurant business. *See id.* at 500, 145 N.E. 250. When the partnership was down to two restaurants, one of the partners sold one of the restaurants and withdrew from the restaurant business. *See id.* at 501, 145 N.E. 250. The other partner operated the remaining restaurant which was the subject of the accounting. *See id.* The court emphasized that a partnership continues until the winding up, noting that "[i]n a court of equity a partner who after the dissolution of the partnership carries on the business with the partnership property is liable, at the election of the other partner, to account for the profits thereof, subject to proper allowances." *See id.* at 506, 145 N.E. 250. A court should take into consideration all of the circumstances surrounding the dissolution of the partnership. *See id.* at 507, 145 N.E. 250. That court held that each partner should be charged with the assets that were retained and account for their respective portions. *See id.*

Nutrition 101 maintains that this is exactly what was done by Mr. Buck. He considered only contracts that were in existence at the time of dissolution and totaled the margins received by each partner. Mr. Buck's analysis determined that Southwest Whey derived $1,320,181.00 while Nutrition 101 derived $351,161.00 from these contracts. Nutrition 101 asserts that the contracts must now be distributed to the parties in proportion to their interest in the partnership. That is the purpose of the going forward portion of Mr. Buck's valuation.

Nutrition 101 notes that Mr. Lewis' second criticism is that the farmers and dairies used in Mr. Buck's analysis were no longer "matched" as they were during the joint venture. However, the contracts with dairies did not require that the whey go to a particular farmer. The contracts with farmers did not require the whey to come from a particular dairy. Nutrition 101 alleges that the fact that Mr. Buck used actual margins is evidence that the contracts were assets despite the fact that there was no "match." It is clear that there were willing farmers in the market to buy whey and that there were other supplies of whey for the farmers that the joint venture had been serving. Nutrition 101 notes that prior to dissolution, farmers came and went. However, this did not terminate the joint venture contract with the dairy. Similarly, although dairies came and went, that did not terminate the joint venture contract with the farmer. Thus, the contracts in effect at dissolution did not disappear because a particular farmer and dairy were not "matched."

Nutrition 101 contends that Southwest Whey cannot argue that the jury's finding controls this portion of the accounting. The jury's finding on Nutrition 101's breach of fiduciary duty count involves Southwest Whey's conduct prior to dissolution. Nutrition 101 asserts that Southwest Whey must still account for its servicing of other joint venture dairy and farmer contracts not "matched." Nevertheless, Nutrition 101 acknowledges that it cannot recover twice the $74,503.41 awarded by the jury. However, it notes that because there may be an appeal on the breach of fiduciary duty count, the judgment on the accounting should not be reduced by that amount.

The third criticism levied by Mr. Lewis is that Mr. Buck used a twenty-one month average margin instead of thirty-three or forty-five months to project the forward revenue potential. Nutrition 101 notes that Mr. Buck employed the twenty-one month period because it was closer in time and believed by him to be more accurate.

In any event, Mr. Lewis did not present an alternative analysis.

Nutrition 101 argues that the reason that Southwest Whey did not provide an alternative valuation is that Mr. Lewis would have had to use the same methodology as Mr. Buck. Mr. Lewis did indicate that if he had been asked to value the contracts, his analysis would have been similar to that of Mr. Buck. Initially, Mr. Lewis noted at his deposition that he had not been asked by Southwest Whey to value the contracts. He later testified that "the contract with the dairy in and of itself does not have value." This prompted an immediate objection from counsel for Nutrition 101 on the basis that it was an undisclosed opinion.[10] The Court allowed Mr. Lewis to continue to testify.

Southwest Whey argues that there is no legal support for Nutrition 101's business valuation model. Specifically, Southwest Whey maintains that its selling of whey east of the Mississippi River since September 16, 1993, does not constitute joint venture business. Rather, this constitutes new business for which it need not account. Citing *Ellerby v. Spiezer*, 138 Ill. App.3d 77, 92 Ill.Dec. 602, 485 N.E.2d 413 (2nd Dist.1985), Southwest Whey likens the situation to the dissolution of a law partnership. In fact, both parties attempt to use this case to their advantage. The defendant in *Ellerby* argued that in the partnership contingent fee cases, the clients had fired the partnership and hired him individually after dissolution. *See id.* at 81, 92 Ill.Dec. 602, 485 N.E.2d 413. He therefore asserted that he was entitled to the entire amount of fees less the reasonable value of services rendered by the partnership prior to dissolution. *See id.* The court held that "[t]he contingent fee

cases pending at the time of dissolution continued to be partnership business after dissolution and any fees from those cases are assets of the partnership." *Id.* at 82, 92 Ill.Dec. 602, 485 N.E.2d 413. Nutrition 101 notes that this is consistent with the general principle that dissolution does not terminate contractual relationships with other parties and that these matters are to be addressed in the winding up of the partnership.

Southwest Whey cites *Ellerby* for the proposition that it is only those contracts in existence at the time of dissolution for which it must account. This would constitute continued business of the joint venture. However, neither the dairy contracts nor the farmer contracts standing alone have value. Thus, Southwest Whey contends that its liability for continuing joint venture business is limited to instances in which Southwest Whey was supplying joint venture farmers with whey from joint venture dairies. Southwest Whey notes that the jury has already awarded Nutrition 101 $74,503.41 which represents one-half of its margins for the continuation of joint venture business. It asserts that Nutrition 101 is entitled to no more than this amount. Southwest Whey also notes that soon after dissolution, Nutrition 101 had persuaded some of the farmers to stop taking whey from Southwest Whey and that only a few farmers continued to receive whey for a substantial period after 1993. Thus, Southwest Whey asserts that Nutrition 101 has received its full share of compensation for continued joint venture business.

Southwest Whey also argues that regarding the question of whether its contracts with dairies constitute assets that

---

**10.** Nutrition 101 has pending a motion to bar certain undisclosed opinions of Michael Lewis. Indeed, Southwest Whey has been late in disclosing some of its expert's opinions. In

its able brief, Nutrition 101 attempts to tell the Court in no uncertain terms what it can and cannot consider in this action. The Court appreciates Nutrition 101's assistance.

should be distributed in a final accounting, no court has ever awarded a partner seeking an accounting for a terminated business with a business valuation-based award. Rather, the valuation method is employed in those instances in which the partnership is to continue. Southwest Whey notes that immediately after the parties stopped formally working together on September 16, 1993, they were in direct competition with one another. It contends that the very fact that the parties were competing with one another is evidence that Southwest Whey was not conducting joint venture business.

Southwest Whey also notes that the very nature of the business relationship pursuant to the contract was such that at dissolution, it would walk away with all of the dairy contracts and Nutrition 101 with all of the farmer contracts with the parties free to compete against one another. Of course, Nutrition 101 would argue—and did successfully argue in its breach of fiduciary duty counterclaim—that Southwest Whey had a head start on the competition when Mr. Muse solicited farmers to continue to do business with him before the joint venture was officially dissolved. Nevertheless, Southwest Whey alleges that Nutrition 101's argument is flawed in that it assumes that Southwest Whey's contracts with dairies are transferable. Southwest Whey questions how anyone, including this Court, can compel third parties such as dairies or farmers to do business with Nutrition 101 or Southwest Whey.

Southwest Whey concludes by arguing that there is no legal support for the notion that all of its post-termination sales constitute a continuation of joint venture business for which it must account. Moreover, the jury has already accounted for that which was a continuation of joint venture business. Southwest Whey contends that it need not account for new business

efforts which is what the accounting counterclaim seeks.

Needless to say, this is an extraordinarily complicated case. One of the reasons for its complexity is that the one page, handwritten joint venture agreement was poorly drafted. Another reason is because of the technical information involved in this dispute. This accounting counterclaim is premised on the idea that the contracts in this case are partnership property in that they were acquired on account of the partnership. *See* 805 ILCS 205/8. Moreover, partners are co-owners of partnership property holding as a tenant in partnership. *See* 805 ILCS 205/25. Following dissolution, each partner has a right to an accounting. *See* 805 ILCS 205/43. The assets of the partnership include partnership property. *See* 805 ILCS 205/40. Nutrition 101 asserts that the assets in this case include the contracts which need to be divided up, noting that the winding up of partnership affairs includes the collection of assets. *See McSweeney v. Buti*, 263 Ill.App.3d 955, 959, 201 Ill.Dec. 831, 637 N.E.2d 420 (1st Dist.1994).

There seems to be little question that a contract can, at least under certain circumstances, be an asset that has value. Nutrition 101 cites two cases for that proposition. In *Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405 (7th Cir.1989), the issue was whether a transaction involving the purchase of the Fund participants trucking assets was in fact a "bona fide sale of assets." *See id.* at 1412. The assets included leases used in the trucking business. *See id.* at 1406–07. The arbitrator who first heard the matter determined that the assumption of the leases did have value. *See id.* at 1412. The Seventh Circuit upheld the arbitrator's finding that the leases had value to the purchaser in light of the reason for the entire transaction—to sell the purchaser

what was required to commence the transportation responsibilities previously performed by the seller. *See id.* Moreover, in *Blaguss Travel Int'l v. Musical Heritage Int'l*, 833 F.Supp. 708 (N.D.Ill.1993), the court addressed whether certain executory contracts would be deemed assets. The Northern District concluded that whether a particular executory contract had value is a question of fact. *See id.* at 712–13.

Nutrition 101 asserts that the record demonstrates that the contracts with the dairies and farmers clearly had value. Nutrition 101 refers to Mr. Muse's testimony that trucker David Dieker had approached him on multiple occasions seeking to purchase Southwest Whey's contract with Prairie Farms Dairy for removal of whey. Nutrition 101 also notes that Southwest Whey's contracts with dairies state that "plant agrees that removal of such whey is a benefit to the plant, as well as being of value to Southwest." Moreover, Nutrition 101 refers to the letter in which counsel for Southwest Whey terminated the joint venture. In that letter, counsel requested a list of Nutrition 101's customers and a list of any new whey supplies and contracts negotiated by Nutrition 101. Nutrition 101 argues that this illustrates that Southwest Whey recognized when it made this request that contracts with farmers were assets of the joint venture as were contracts with the plants entered into during the joint venture. Moreover, it contends that the contract with the dairy had value apart from it being tied to a particular farmer. Nutrition 101 notes that Mr. Lewis testified that because there were other farmers, the Raskas, Nauvoo and Peavely contracts had value even though the original farmers boycotted the joint venture. Thus, a dairy contract has value whether or not the whey is sold to a particular farmer. It needs only to be sold. Moreover, the discount rate used by Mr. Buck in his analysis is the same as that used by Mr. Lewis in other lawsuits. This takes into account the possibility of fluctuations in the farmer market as the farmers sometimes came and went. Therefore, Nutrition 101 contends that the contracts entered into during the joint venture had value whether or not the whey was sold to a particular farmer.

Undoubtedly, the contracts here at least potentially had value because of their possibility for generating revenue. It is clear that this was a lucrative enterprise for both parties. Because of the market in the farming industry, it was of value to the joint venture to remove the whey from the various plants. It was also of value to the plants to dispose of their whey in this manner. It was clear by the end of 1992 that the joint venture did not have much of a future. After March 1993, the parties were not really communicating with each other except through attorneys. As the Court earlier noted, Southwest Whey and Nutrition 101 negotiated several ways in which to end the joint venture. For whatever reason, none of these proposed agreements was acceptable. Therefore, because of the nature of the parties' responsibilities pursuant to the agreement, the logical end to the venture was that Southwest Whey would end up with a healthy supply of whey and no farmers while Nutrition 101 would have plenty of farmers but no source of whey. Of course, Mr. Muse met with some of the farmers immediately prior to dissolution in order to ensure their continued service. This enabled Southwest Whey to hit the ground running following the termination of the joint venture. The jury determined that this was a breach of fiduciary duty and awarded Nutrition 101 damages in the amount of $74,503.41. Pursuant to its business valuation model, Nutrition 101 argues that it is entitled to an additional $917,800.00 which

represents lost profits since dissolution and future lost profits.

The Court does not agree with Nutrition 101's business valuation model. There are several reasons why Nutrition 101 is not entitled to an award of $917,800.00 for the final accounting of assets and total valuation of joint venture assets. The evidence showed and the jury determined that Nutrition 101 breached its fiduciary duty in ceasing marketing efforts by the summer of 1992. In a November 1992 letter to Mr. Peter, Mr. Muse discussed the possibility of shutting down the joint venture. One of his concerns was that Mr. Peter was no longer marketing new whey supplies but was at most maintaining the current supply. In early 1993, the parties discussed various proposals to end the joint venture, none of which were acceptable. In March 1993, Mr. Peter indicated that he could not sell whey while Mr. Muse was threatening to shut the operation down. Mr. Muse responded by stating that with the exception of his November 1992 letter, he had not mentioned the possibility of a shutdown. Moreover, Mr. Muse's March letter notes that Mr. Peter's sales efforts had been below par since July 1992, several months before he raised the possibility of a shutdown. Mr. Muse further states that he had made commitments to the plants which he intended to honor. This would not be possible without Mr. Peter's efforts at continuing to sell the whey. However, the parties never really directly communicated with one another after March 1993.

The record is clear that Nutrition 101 did in fact cease marketing efforts by the summer of 1992. The potential result was that the various plants under contract would have volumes of unsold whey. Clearly, the parties had separate business philosophies and different ideas about the future of the whey business.[11] These differences in philosophy were a major reason that problems arose between Mr. Muse and Mr. Peter which ultimately led to the dissolution of the joint venture. As the Court has noted, Nutrition 101's major responsibility pursuant to the joint venture agreement was to "develop the market for whey supplies." While Nutrition 101 did develop the whey market, it nevertheless ceased marketing efforts by the summer of 1992. It was important that there be some degree of consistency between the amount of whey that was being removed from the dairies and the amount of whey that was being sold to the farmers. When the dairies produced more whey than was being removed, they were described as being "long on whey." The evidence indicated that while this occurred with certain dairies throughout the joint venture, it was a more frequent occurrence after the summer of 1992 with at least five dairies being long. There were often complaints from dairies when more whey was being produced than hauled.[12] The only way to

11. For example, the parties disagreed over whether or not the plants should be charged fees for the removal of their whey. Mr. Muse generally believed that it was not necessary to ask the plants to start paying fees. Mr. Peter thought that the joint venture should get additional margins in the form of plant fees, rationalizing that the removal of whey was a major benefit to the plants.

12. For example, Dick Alber was the plant manager of Dean Foods in Rochester, Indiana. In March 1993, Mr. Alber spoke to

Nutrition 101 employee Gary Donley, noting that he was long on whey and looking for answers. This prompted what was apparently the final exchange between Mr. Peter and Mr. Muse before the two began communicating solely through attorneys. Mr. Peter indicated that he could not sell whey under threat of a shutdown. Mr. Muse responded by noting that he had only mentioned the possibility of a shutdown in his November 1992 letter and that he had no intention of actually terminating the joint venture.

solve the problem would be to sell the whey to farmers or others who needed it for whatever reason. However, the evidence indicates that by this time, Nutrition 101 had stopped marketing the whey. Therefore, it strikes the Court as inequitable to allow Nutrition 101 to capitalize on Southwest Whey's efforts since September 16, 1993, when it was failing to market a substantial portion of the whey produced by the dairies.

The Court noted earlier that because the agreement did not address what happened at dissolution, the logical ending to the venture would be that Southwest Whey would have the dairies and Nutrition 101 would have the farmers. Of course, Mr. Muse contacted some of the farmers prior to dissolution and persuaded them to continue obtaining their whey from Southwest Whey.[13] However, it was clear to both parties that the venture was coming to an end throughout 1993. Mr. Peter and Mr. Muse had discussed several proposals regarding how to end it and were basically communicating only through their attorneys. Mr. Muse testified in his deposition that by September 1993, it was his intention to take over the joint venture because of Nutrition 101's continued refusal to pay Southwest Whey what it was owed. The evidence showed and the jury determined that Southwest Whey was due $102,492.43 from Nutrition 101 in unpaid margins for 1993. While Southwest Whey did have to account to Nutrition 101 for various expenses, the total amount of the expenses was much lower than the figure owed by Nutrition 101.

During this period, Nutrition 101 was using its "offsetting" method of paying Southwest Whey. Specifically, the reason that it withheld margins from Southwest Whey was because of the money that it was owed.[14] However, Mr. Peter conceded that by at least May 1993, Southwest Whey would be due funds from Nutrition 101 even taking into account the money to which Nutrition 101 was entitled. Nevertheless, Nutrition 101 failed to pay Southwest Whey in May, June, July, August and September of 1993. Thus, Mr. Muse decided that it was time to end the joint venture. The fact that Nutrition 101 had stopped paying Southwest Whey is yet another reason why it would be inequitable to allow Nutrition 101 to capitalize on Southwest Whey's post-dissolution efforts.

Moreover, there is evidence in the record that Nutrition 101 was contacting some of the dairies before the end of the joint venture. Of course, the agreement provides that Southwest Whey will contract for whey supplies. Nevertheless, Mr. Muse testified that before dissolution, Mr. Peter contacted several of the dairies regarding obtaining his own supply. Mr. Muse specifically mentioned that Mr. Peter had contacted Meadow Gold in Champaign, Illinois. Although Southwest Whey's written contract with Meadow Gold expired in October 1992, Southwest Whey apparently maintained the whey supply under an oral agreement. Mr. Muse also testified that he learned from plant managers that there were other dairies that Mr. Peter talked to during the life of the joint venture. The jury was apparently not persuaded by this testimony or determined that the allegations did not constitute a breach of contract or breach of

---

13. On September 2, 1993, Mr. Muse flew to St. Louis and contacted most of the farmers in the joint venture area. He testified that the only farmers that he did not contact were Don Huftalin, Stan and Ed Lentz, Randy Peter and Crystal Pork. Crystal Pork is one of the Peter farms.

14. Nutrition 101 had sent Southwest Whey an invoice in January 1993 for the Gauntt and Paxton receivables. When Southwest Whey did not pay, Nutrition 101 began its procedure of "paying by offset."

fiduciary duty. The Court, however, finds some of that testimony to be credible. It therefore appears to the Court that Mr. Peter also realized that the joint venture was coming to an end and was attempting to find whey suppliers so that he would have a source for the farmers. This is similar to what Mr. Muse did with the joint venture farmers, except that he persuaded some of them to allow Southwest Whey to supply them with whey. In any event, this is another reason why it would be best to leave the parties where they are.

Nutrition 101 seems to suggest that because the parties engaged in buy-sell negotiations in 1993 based on the volume of whey, the contracts with the dairies and farmers were assets. Another argument that Nutrition 101 makes is that Southwest Whey specifically asked in its letter dissolving the joint venture for a list of any new whey supplies and contracts negotiated by Nutrition 101, recognizing that these were assets. An asset was described by Mr. Buck as being something of value to an entity. Moreover, the fact that trucker David Dieker wanted to purchase Southwest Whey's contract with Prairie Farms proves that the contracts with dairies were assets. Accordingly, Nutrition 101 argues that the Court must accept Mr. Buck's business valuation model.

Nutrition 101 notes that at dissolution, each party should have retained half of the assets. This could have been done by dividing the business between Illinois and Indiana or having each party serve a certain number of dairies and farmers. Although no agreement on dividing the business was reached, Nutrition 101 emphasizes that one of the proposed agreements specifically called for Nutrition 101 to transfer "all of its interest in and to the assets of the joint venture." That proposal also called for Nutrition 101 to renew the account with Pinkerton farms. Hence, Nutrition 101 contends that the fact that Southwest Whey wanted the contract in place proves that the contracts with the farmers were assets. Moreover, that proposal called for the parties to assign contracts "to effectuate sole ownership of all properties presently held in the joint venture to Southwest Whey." Nutrition 101 asserts that this proves that the contracts were assets of the joint venture.

The Court does not question that the contracts were potentially significant sources of revenue. The evidence indicated that the contracts to provide the farmer with whey or dispose of the whey from dairies could indeed be lucrative. Similarly, if there were farmers willing to buy whey from Mr. Dieker, then Southwest Whey's contract with Prairie Farms could potentially be a major source of revenue for him. In that sense, the contracts were assets. However, the overall success of the joint venture depended upon each party fulfilling its responsibilities pursuant to the agreement. This is because the contracts with dairies and farmers alone had little, if any, value. Nevertheless, Nutrition 101 contends that even if the farmers and dairies used in Mr. Buck's analysis were no longer "matched," there were still willing farmers in the market to buy whey and other supplies of whey for the farmers that the joint venture had been serving. Nutrition 101 therefore asserts that the contracts are assets needing to be valued in this accounting.

Even assuming that the contracts are assets, the Court is skeptical of Nutrition 101's business valuation model.[15] As

15. Southwest Whey asserts that no court has ever awarded a joint venturer seeking an accounting for a terminated business with a business valuation-based award. Nutrition 101's brief did not point to any instance in which this occurred. Moreover, the Court was unable to find any cases in which that methodology was used.

Southwest Whey notes, the logical end of the joint venture absent any agreement to divide the business was that Southwest Whey would have walked away with all of the dairy contracts and Nutrition 101 with all of the farmer contracts with the parties free to compete against one another. This is based on the parties' responsibilities pursuant to the joint venture agreement. Specifically, Southwest Whey's responsibility was to contract for whey supplies while Nutrition 101 was to develop the market for whey. If the business were divided in this fashion, Southwest Whey would have sources of whey and would have to find customers. Nutrition 101 would have customers for the whey but would have to find sources. The Court has referred repeatedly to Mr. Muse's solicitation of farmers before the dissolution of the joint venture and recognizes that this has some impact on a division of the business in this manner. The Court has also continuously noted that Southwest Whey was penalized for this conduct in Nutrition 101's breach of fiduciary duty counterclaim.

The evidence is clear that the parties were competing with one another almost immediately after the joint venture was dissolved. Mr. Peter admitted that Nutrition 101 has been competing with Southwest Whey since at least October 1, 1993, which was about two weeks after the dissolution. The Court finds that the parties should be left where they are. As the Court has noted, the best way to divide the business was to have Southwest Whey keep the dairy contracts and Nutrition 101 keep the farmer contracts and allow the parties to compete with one another. Southwest Whey did solicit the farmers prior to the end of the joint venture. However, the Court finds that Nutrition 101's conduct in failing to pay Southwest Whey and in ceasing marketing efforts led to Mr. Muse's decision to dissolve the joint venture. It was as if Mr. Peter induced the end of the joint venture. Nutrition 101

therefore should not be rewarded for Southwest Whey's efforts with the dairies and farmers since September 1993. It simply would not be fair or equitable.

Most of Southwest Whey's efforts since 1993 therefore constitute new business. The same is true of the efforts of Nutrition 101. Nutrition 101 is entitled to that which is a continuation of joint venture business. As the jury determined in Nutrition 101's breach of fiduciary duty counterclaim, Nutrition 101 is entitled to $74,503.41 for Southwest Whey's continuation of joint venture business.

### D. The Raskas Settlement Proceeds

█ The third part of the accounting is the division of the $450,000.00 settlement from Raskas Foods for breach of a joint venture contract. This involves a lawsuit that was initiated by Raskas against these parties in St. Louis County Circuit Court. It has been settled for $450,000.00, the sum of which is to be divided by this Court.

As an initial matter, the Court notes that the Raskas Dairy is located in St. Louis and is therefore west of the Mississippi River. Pursuant to the joint venture agreement, Nutrition 101 had exclusive marketing rights east of the Mississippi River and in other areas by mutual agreement. Mr. Muse testified that he did have a specific agreement with Nutrition 101 allowing it to market the Raskas supply of whey. Mr. Muse noted that this was an oral understanding that was terminable at will.

The joint venture's dealings with Raskas began in August 1989 when Southwest Whey entered into a contract with Raskas on behalf of the joint venture. In March 1991, there was a farmer boycott in Illinois. This resulted in the loss of five farmers who had been obtaining whey from the joint venture. Apparently, the

farmers' intent was to obtain the whey directly from the plant and therefore reduce their margins. The result was that the joint venture lost several customers and Raskas terminated the contract, asserting that the parties had breached the contract by not removing all of the whey. Nevertheless, in April 1991, Southwest Whey and Nutrition 101 negotiated a new contract with Raskas. The new contract was a guarantee to take all of the whey. Because of the boycott, there was a significant amount of excess whey. The result was that the parties had to dump a substantial amount in Mr. Peter's lagoon in Quincy, Illinois, and in other places. Mr. Muse and Mr. Peter were soon able to rebuild the market in St. Louis which temporarily resolved this problem for the most part.

By May 1992, the farmers were once again pressuring Raskas to get the supply. Apparently, Raskas learned that Southwest Whey was somewhat long and dumping the excess whey at a farm outside of Washington, Missouri. The bottom line is that in June 1992, Raskas terminated the contract. The result was that Raskas' whey supply was once again going to the Illinois farmers that had organized the boycott. At this point, Mr. Muse and Mr. Peter decided to pursue legal action against Raskas. Southwest Whey and Nutrition 101 in October 1992 signed an agreement with Attorney Richard Pundt of Cedar Rapids, Iowa, to pursue legal action against the Raskas Dairy and the Illinois farmers.[16] The dissolution of the joint venture on September 16, 1993, effectively stopped the joint litigation against Raskas.

Mr. Pundt filed suit on behalf of Southwest Whey against Raskas sometime in 1995. Nutrition 101 subsequently hired its own attorney and filed a petition to intervene in that action.[17] The suit was eventually dismissed in late 1995 or early 1996 with the plan to re-file it in another court. Before this could be done, Raskas filed a petition for declaratory relief against both Southwest Whey and Nutrition 101 in St. Louis County Circuit Court, essentially contending that it had a right to terminate the agreement. That is the suit that ultimately settled for $450,000.00 in February 2000, the division of which is before this Court.

Nutrition 101 contends that the settlement proceeds are partnership property to be divided equally, noting that there is no dispute that the contract with Raskas was entered into for the benefit of the joint venture. Nutrition 101 notes that Raskas had both parties sign confidentiality agreements. Moreover, Southwest Whey and Nutrition 101 shared the profits as well as the losses. Additionally, on July 27, 1992, Mr. Muse wrote Dr. Herschel Raskas on behalf of both Southwest Whey and Nutrition 101, demanding that Raskas adhere to its contract. As the Court noted, the parties jointly hired an attorney to pursue litigation against both the farmers and dairies involved in the boycott. Both Nutrition 101 and Southwest Whey paid Mr. Pundt. Moreover, Raskas sued both parties. Southwest Whey ultimately settled that suit on behalf of itself and Nutrition 101.

Nutrition 101 notes that the settlement represents the total revenue from the joint venture contract with Raskas. Pursuant to the agreement, revenue was to be equally divided between the parties. Therefore,

---

**16.** Southwest Whey settled its claim against the farmers for $400,000.00. Nutrition 101 settled its claim against the farmers for $350,000.00. Both sides paid their own attorneys' fees.

**17.** When Nutrition 101 attempted to intervene, Mr. Pundt had to withdraw as Southwest Whey's counsel. Southwest Whey therefore hired another attorney.

Nutrition 101 asserts that it is entitled to one-half of the settlement proceeds in the winding up.

Southwest Whey notes first that the contract at issue was between Southwest Whey and Raskas and makes no mention of Nutrition 101 or a joint venture. Nevertheless, none of the contracts with dairies for whey supplies mentioned Nutrition 101 because it was Southwest Whey's responsibility to deal with the dairies. This factor is therefore irrelevant. There is no dispute that there was a verbal agreement between the parties that Nutrition 101 would market the Raskas whey supply. Southwest Whey notes that there was no termination clause in the verbal agreement. Hence, the agreement was terminable at will. Southwest Whey also notes that Nutrition 101 was not a party to the settlement discussions. Its three attempts to intervene in the settlement negotiations were unsuccessful. Southwest Whey therefore asserts that Nutrition 101 is entitled to nothing more than a share of the settlement proceeds in direct proportion to the duration of the joint venture. The joint venture continued from the time the second Raskas agreement was breached in June 1992 until September 16, 1993.

In asserting that Nutrition 101 should be entitled to merely an allocated portion of the settlement proceeds in direct proportion to the duration of the joint venture, Southwest Whey computed the average profit margin on whey sales from the Raskas Dairy from September 1991 through May 1992. Of course, May 1992 was the last full month prior to the Raskas termination. The average profit margin on whey sales from the Raskas dairy for that nine-month period was $4,630.32.[18] Southwest Whey uses that figure as an average in arguing that the $450,000.00

paid by Raskas in settlement represents just over ninety-seven months of profit from sales from that dairy. Because the joint venture continued for only fifteen months following Raskas' termination of the contract in May 1992, Southwest Whey contends that Nutrition 101 should be entitled to receive an allocated portion of the proceeds equivalent to fifteen months of lost profit.

Southwest Whey therefore argues that Nutrition 101's portion of the Raskas settlement proceeds should be determined by multiplying the monthly average of $4,630.32 times the fifteen months that the joint venture remained in existence following the Raskas termination of the contract. This results in a total of $69,454.73. That sum would then be divided by two to determine each company's share, yielding a figure of $34,727.37. Southwest Whey further argues that Nutrition 101's recovery must also be reduced to account for the legal fees that it incurred in recovering the settlement account. Southwest Whey contends that Nutrition 101's proportionate share of legal fees is $21,839.45. Thus, after withholding this figure from Nutrition 101's recovery, Southwest Whey asserts that the net amount owed to Nutrition 101 is $12,887.92.

The basis of Southwest Whey's argument is that Nutrition 101 is essentially seeking future profits. Citing *Target Market Publishing, Inc. v. Advo, Inc.*, No. 94 C 2535, 1995 WL 88994, (N.D.Ill. Feb.24, 1995), Southwest Whey argues that because Nutrition 101's right to distribute the supply of Raskas whey was terminable at will, it is an inappropriate basis by which to make a claim for future damages. The Court is not persuaded by Southwest Whey's reliance on that case.

---

**18.** The following were the monthly profit margins from September 1991 through May 1992:(1) $6,340.00; (2) $6,676.34; (3) $5,720.00; (4) $5,008.00; (5) $3,256.50; (6) $2,910.00; (7) $3,974.00; (8) $4,023.00; and (9) $3,765.00.

Although the joint venture agreement leaves much to be desired, its terms do address the dispute as to the Raskas proceeds. Paragraphs five and six of the agreement indicated that Nutrition 101 would have the right to market whey in areas west of the Mississippi River by mutual consent. Southwest Whey acknowledges that the parties had an oral agreement that Nutrition 101 would market the whey from Raskas. The other relevant part of the agreement is paragraph twelve. Pursuant to paragraph twelve, revenue would be divided equally between Southwest Whey and Nutrition 101. Because it was a contract entered into during the joint venture and Nutrition 101 had marketing rights throughout the duration of the contract, the revenue should be divided equally between the parties.

Significantly, as Nutrition 101 notes, Raskas had both parties sign confidentiality agreements. Moreover, Southwest Whey and Nutrition 101 shared the profits and the losses. Additionally, Mr. Muse in July 1992 wrote a letter to Dr. Raskas on behalf of Southwest Whey and Nutrition 101 requesting that Raskas adhere to its contract. As the Court earlier noted, the parties in 1992 jointly hired Mr. Pundt to pursue legal action against the farmers and Raskas. Raskas sued both Southwest Whey and Nutrition 101. That action was settled by Southwest Whey on behalf of both parties. These factors indicate that the settlement should be divided equally. The Court is not persuaded by Southwest Whey's argument that because Nutrition 101's right to market the Raskas supply of whey was terminable at will, Nutrition 101 should only be entitled to a portion of the proceeds in proportion to the duration of the joint venture. While it may be true that Southwest Whey could have terminated Nutrition 101's right to market that whey at any time, the fact of the matter is that Southwest Whey never exercised that right. If Southwest Whey had done so, then it would have a better argument that Nutrition 101 is not entitled to one-half of the settlement proceeds. The crucial fact is that when Raskas terminated the contract in June 1992, Nutrition 101 was marketing that supply of whey. It was not until fifteen months later that Southwest Whey dissolved the joint venture. The Court therefore finds that the parties should equally split the Raskas settlement proceeds.

Southwest Whey contends that the claims in the Raskas case were for more than merely lost profits. Southwest Whey maintains that it had claims for the potential injury to its national operations resulting from the actions of Raskas. However, Southwest Whey does not point to any evidence in the record to support this assertion.

Southwest Whey also alleges that Nutrition 101's share of the proceeds must be offset by a portion of Southwest Whey's legal fees in obtaining the recovery. Specifically, Southwest Whey argues that Nutrition 101's recovery should be reduced by $21,839.45. Southwest Whey notes that Nutrition 101 will likely argue that it also incurred legal fees. Southwest Whey nevertheless contends that Nutrition 101's expenditures in this regard were "wholly unnecessary, unproductive and did nothing to secure the settlement." However, the Court finds that because the amount of the settlement proceeds to be divided was in dispute, it was necessary for Nutrition 101 to hire an attorney to protect its interest. Therefore, it is only equitable that each party bear its own legal fees.

Southwest Whey also asserts that the $5,000.00 Arthur Anderson expert fee must be deducted from the settlement corpus. This was the amount that Arthur Anderson charged Southwest Whey for producing a number with which it could

negotiate a settlement with Raskas. The Court agrees that because this expenditure led to the settlement, the parties should split the cost. The settlement proceeds will therefore be reduced by $5,000.00. This results in a corpus of $445,000.00.

Accordingly, the Court will deduct the $5,000.00 expert fee from the $450,000.00 settlement. This results in a balance of $445,000.00. The Court finds that the parties should equally divide these proceeds. Thus, Southwest Whey and Nutrition 101 are each entitled to $222,500.00 of the Raskas settlement proceeds.

### III. RECAP

The Court will now attempt to summarize its findings on Nutrition 101's petition for accounting counterclaim. Of course, the jury's verdicts have some bearing on this point. Before entering judgment on the jury's verdicts, the Court will adjust its verdict on Southwest Whey's conversion count. Specifically, the jury's verdict on that count will be reduced from $83,877.02 to $19,943.68.

After considering the jury's findings regarding the debts and other expenses in the accounting of operations during the joint venture as noted in its itemized verdict on Southwest Whey's conversion count, the Court finds that Southwest Whey is entitled to $23,481.91 from Nutrition 101 for that period. As for the accounting since dissolution, the jury determined that Nutrition 101 was entitled to $74,503.41 for Southwest Whey's continuation of joint venture business. The Court agrees. The Court finds that Nutrition 101 is entitled to nothing more than $74,503.41 in this portion of the accounting. Although Nutrition 101 cannot recover this amount twice, the Court will nevertheless include it in the accounting in case the jury's verdict on its breach of fiduciary duty count is appealed. As for the Raskas settlement proceeds, Nutrition 101 is enti-

tled to $222,500.00. Accordingly, Nutrition 101 is entitled to $273,521.50 in its accounting counterclaim.

### IV. CONCLUSION

*Ergo,* the Court hereby enters judgment on the jury's verdict for Nutrition 101 on Southwest Whey's breach of contract count. The Court enters judgment on the jury's verdict for Southwest Whey on its breach of fiduciary duty count in which it assessed damages in the amount of $18,464.00. The Court will adjust the jury's verdict on Southwest Whey's conversion count before entering judgment. The jury found for Southwest Whey on that count and assessed damages in the amount of $83,877.02. The Court hereby adjusts the verdict on Southwest Whey's conversion count to $19,943.68 and enters judgment accordingly. The Court also enters judgment on the jury's assessment of punitive damages against Nutrition 101 in the amount of $300,000.00.

The Court will enter judgment on the jury's verdict for Southwest Whey on Nutrition 101's breach of contract count. Judgment is also entered on the jury's verdict for Southwest Whey on Nutrition 101's interference with prospective business advantage count. The Court also enters judgment on the jury's verdict for Nutrition 101 on its breach of fiduciary duty count in which it assessed damages in the amount of $74,503.41. Finally, judgment is entered on the jury's assessment of punitive damages against Southwest Whey in the amount of $20,000.00.

Regarding Nutrition 101's petition for accounting counterclaim, Nutrition 101 is due $273,521.50 from Southwest Whey. This figure includes the same $74,503.41 awarded to Nutrition 101 by the jury in its breach of fiduciary duty count. Nutrition 101 cannot recover that amount twice. However, the Court is also including that

in the accounting counterclaim because it represents the total due Nutrition 101 for Southwest Whey's continuation of joint venture business. The total due Nutrition 101 also includes the $2,522.67 which represents its share of Jaeggie Dairy revenue. This figure has apparently not yet been paid to Southwest Whey. Nutrition 101 will not be entitled to these funds until they are paid to Southwest Whey. The Court is assuming that these funds will eventually be paid to Southwest Whey and is therefore including them in Nutrition 101's petition for accounting. Accordingly, Southwest Whey is ORDERED to pay Nutrition 101 $273,521.50 pursuant to Nutrition 101's petition for accounting.

In light of the Court's rulings, all pending motions are DENIED AS MOOT. CASE CLOSED.